UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

|  |  |
|---|---|
| GEORGE WEST,<br>ROBERT JONES, and<br>BRADY FULLER, on behalf of themselves<br>and all others similarly situated,<br><br>                     Plaintiffs,<br>      v.<br><br>CITY OF SANTA FE, TEXAS;<br>CARLTON GETTY, Municipal Judge, in his<br>individual capacity; and<br>JEFFREY POWELL, Chief of Police, in his<br>official capacity;<br><br>                     Defendants. | Civil Action No. 16-cv-309<br>**Jury Trial Demanded** |

**CLASS ACTION COMPLAINT**

1.      The City of Santa Fe is running a modern-day debtors' prison, prioritizing raising revenue for the City over administering justice fairly.  Those with means pay a one-time fine for common offenses like traffic tickets.  But those who cannot afford to pay upfront—the disabled man on a fixed income, the young veteran who just started a small business, the blue-collar worker supporting his family—are trapped in a maze of escalating fines and fees that can take years to pay off. Anyone who falls behind faces imprisonment

in unconscionable conditions without the opportunity to see a judge or explain the circumstances that prevent payment.

2.      City officials have colluded on this unconstitutional two-tiered system of justice. The City and the Municipal Judge agreed to raise the cost of traffic and other misdemeanor fines to boost revenue.  The City then uses multiple constitutional violations as leverage to extract payments from local residents, tacking on further fines and fees at every opportunity. Although traffic violations are, by law, not jailable offenses, police officers regularly jail people who fail to pay their fines without giving them access to a lawyer or the chance to mount a legal defense. Officers do not afford them the opportunity to see a judge for the constitutionally mandated hearing on their ability to pay. The police chief intentionally makes jail intolerable, giving the people he detains too little food to eat and depriving them of medical care.

3.      Plaintiffs George West and Robert Jones are caught in this maze—unable to afford to pay their outstanding fines to the City of Santa Fe and unable to seek relief from the judge. There is a high risk that Santa Fe police officers will arrest and jail Mr. West and Mr. Jones in violation of their right to due process, right to equal protection, right to counsel, and right against cruel and unusual punishment. They seek declaratory and injunctive relief protecting themselves and all other similarly situated people from violation of their constitutional rights.

4.      Plaintiff Brady Fuller has already been jailed by the City of Santa Fe because he could not afford to pay his fine. The City jailed him in violation of his right to due process, his right to equal protection, his right to counsel, and his right against cruel

and unusual punishment. He seeks damages on behalf of himself and all other similarly

situated people whom the City has already jailed.

## JURISDICTION AND VENUE

5.      This is a civil rights action arising under 42 U.S.C. § 1983 (civil action for

deprivation of rights) and 28 U.S.C. §§ 2201–2202 (declaratory judgments). This Court

has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil

rights jurisdiction).

6.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1), because the

City of Santa Fe resides in this district, and under § 1391(b)(2), because a substantial part

of the events giving rise to the Plaintiffs' claims occurred in this district.

## PARTIES

**I.      There is a High Risk That the City of Santa Fe Will Jail George West**

7.      Plaintiff George West is a fifty-seven-year-old resident of La Marque,

Texas. He used to own a trailer house in Hitchcock, but he was evicted from his lot

because he didn't have enough money to pay his rent. He receives mail at his aunt's

home in La Marque. Otherwise, he stores his belongings in his pickup truck and he does

not have a fixed residence.

8.      Mr. West has lived near or below the federal poverty line since he was

released from prison for drug possession more than ten years ago. Mr. West's financial

situation has only gotten worse in recent years. He has found honest work in scrap metal

salvage and as a day laborer since he was released from prison. But serious repetitive

motion injuries from this work, as well as worsening rheumatoid arthritis, keep Mr. West

from working like he used to. Mr. West's arthritis has gotten so bad that he was recently approved for a social security disability benefit.

9.      When Mr. West was released from prison, he could not obtain a valid Texas driver's license, because he owed surcharges for old traffic tickets to the Department of Public Safety. Yet he needed to drive to make money to pay his tickets. Between his surcharges, child support obligations, new tickets for driving without a valid license, and basic living expenses, Mr. West has not been able to work his way out of debt since he was released from prison.

10.      These were the financial circumstances Mr. West faced when a Santa Fe police officer pulled him over many years ago.

11.      Mr. West is Black. He generally goes out of his way to avoid driving through Santa Fe. But in 2005, Mr. West drove through Santa Fe after leaving a scrapyard.  He stopped at a stoplight with a Santa Fe police officer facing in the opposite direction, in the lane of oncoming traffic. When the light turned green, the officer immediately made a U-turn, got behind Mr. West, and turned on his lights.

12.      The officer claimed to be stopping Mr. West for broken brake lights.

13.      The officer wrote Mr. West tickets for four offenses: expired registration, open container, no driver's license, and no insurance. The open container was a beer can that a friend had brought into the car; Mr. West had not been drinking that day. Mr. West had committed the remaining offenses due to his poverty.

14.      Because of Mr. West's poverty offenses, the total fines for this single police encounter came up to over $600. As opposed to other people, who could write a check to

resolve their cases, Mr. West could not afford to pay these fines. Court clerks put Mr. West on the track to jail when they issued a warrant for his arrest.

15.    Once a warrant issued, the Municipal Court refused to allow Mr. West to clear his warrants or see a judge unless he paid a cash bond for the total cost of his fines—now over $1100—which he could not afford to do.

16.    Mr. West tried to find a way to appear in court and get back on track to a valid driver's license without paying the full cash bond. He paid $65 for an attorney to help him appear in court and clear the warrants for all of his tickets.

17.    When Mr. West appeared in Santa Fe Municipal Court and pled no contest, the Municipal Judge sentenced him to an $1137 fine and ordered him to pay it within sixty days. The judge did not ask any questions about Mr. West's ability to pay or discuss alternatives to prompt payment in full. Mr. West had absolutely no prospect of coming up with that amount of money, but the Municipal Court ordered him to pay anyway.

18.    After Mr. West failed to pay $1137 within sixty days, court clerks issued capias pro fine warrants for his arrest. After the clerks issued capias pro fine warrants, the fees assessed against Mr. West more than doubled his initial fine. He now owes nearly $1500 to the City of Santa Fe.

19.    The Municipal Court now refuses to allow Mr. West to clear his warrants unless he pays the total cost of his fines, nearly $1500, which he cannot afford to do. The court will not allow Mr. West to set a court date to explain his inability to pay and ask for an alternative to jail.

20.     Despite his best efforts, Mr. West cannot spare any money to pay toward his fines. Mr. West wants a chance to serve a one-time penalty, just like someone who could afford to write a check, and move on from this one traffic stop more than ten years ago. At a minimum, he wants a chance to explain his financial situation to a judge before he is jailed by the Santa Fe Police Department.

21.     Mr. West must drive his truck around the Santa Fe area in order to buy food and get to doctor's appointments. Because the City of Santa Fe has reported Mr. West's outstanding fines to the Department of Public Safety, he cannot obtain a valid Texas driver's license. Mr. West is at high risk for being arrested and jailed by the Santa Fe Police Department in violation of his right to due process, right to equal protection, and right against cruel and unusual punishment.

## II.     There is a High Risk That the City of Santa Fe Will Jail Robert Jones

22.     Robert Jones is a twenty-four-year-old father, a small business owner, and a lifelong resident of the Santa Fe area.

23.     Mr. Jones enlisted in the Marine Corps shortly after graduating from high school. He suffered an injury after basic training, and he was discharged for medical reasons. Following his discharge in 2011, Mr. Jones has worked jobs in demolition, custodial work, and fencing installation.

24.     Mr. Jones and his family started a plumbing company a few months ago to try to make ends meet. Business is slow, and Mr. Jones isn't making enough to cover his overhead. His household lives below the federal poverty line.

25.     Back in 2013, a Santa Fe police officer pulled Mr. Jones over. The officer said that he had run Mr. Jones's license plate, and a notice came back that there was no insurance on the car. Mr. Jones did not have insurance. The officer wrote Mr. Jones a ticket and told him to go home.

26.     As opposed to other people, who could write a check to resolve their cases, Mr. Jones could not afford to pay his ticket outright. He had recently started working at Pioneer Waste Services, a demolition company, but he was still living near the poverty line.

27.     Mr. Jones appeared in Santa Fe Municipal Court on his court date, and he was up front with the Municipal Judge that he had a low income. He knew he could not afford the payments that the judge was ordering. The Municipal Judge considered jail to be a foregone conclusion for someone who couldn't afford to pay, and told Mr. Jones that a warrant would issue for his arrest.

28.     Mr. Jones circled "no contest" and signed his payment plan paperwork as ordered. The Municipal Judge sentenced him to a fine.

29.     Neither the judge nor anyone else asked Mr. Jones about his ability to pay.

30.     Neither the judge nor anyone else advised Mr. Jones of his right to counsel. Mr. Jones was not represented by counsel, nor did he waive his right to counsel.

31.     The day after his court appearance, Mr. Jones asked his grandmother about the best way to handle his unaffordable payments. His grandmother owned her own cleaning company that cleaned the Police Department and Jail, so she was familiar with the people who worked there. She advised him to call a woman named Sheryl who was

responsible for issuing warrants. Mr. Jones called Sheryl and explained that he could not afford his payments. Because Sheryl knew his grandmother, she agreed to refrain from issuing a warrant.

32.     Since receiving his ticket, Mr. Jones has worked various day labor jobs, but he has always lived near or below the federal poverty line.

33.     Mr. Jones's grandmother died in November 2014, and Sheryl is no longer the employee responsible for issuing warrants. The Santa Fe Municipal Court has issued a capias pro fine warrant for Mr. Jones's arrest, and his fine has climbed to $875.

34.     The Municipal Court now refuses to allow Mr. Jones to clear his warrant unless he pays the balance of his fine, which he cannot afford to do. The court will not allow Mr. Jones to set a court date to explain his inability to pay and ask for an alternative to jail.

35.     Mr. Jones is afraid of being pulled over by the Santa Fe police. Mr. Jones and his brothers are mixed-race, and they have had bad encounters with the Santa Fe police in the past. His older brother in particular has been subject to excessive force on more than one occasion; once, when Mr. Jones's brother refused to stop laughing at an officer for locking himself out of his car, the officer retaliated by tasing him just above his heart. Mr. Jones wants to avoid interactions with the Santa Fe Police Department if at all possible.

36.     Despite his best efforts, Mr. Jones cannot spare any money to pay toward his fine. Mr. Jones wants to pay a one-time penalty, just like someone who could afford to write a check for his entire fine, and move on from driving with no insurance three

years ago. At a minimum, he wants a chance to explain his financial situation to a judge before he is jailed by the Santa Fe Police Department.

37.    Mr. Jones has a newborn daughter. He must drive around the Santa Fe area in order to buy food, get to doctor's appointments, and get to jobs for his family's plumbing company. Mr. Jones is at high risk for being arrested and jailed by the Santa Fe Police Department in violation of his right to due process, right to equal protection, and right against cruel and unusual punishment.

**III.    The City of Santa Fe Unconstitutionally Jailed Brady Fuller**

38.    Brady Fuller is a resident of Santa Fe, Texas. He lives with and supports his wife and three daughters.

39.    For at least the last two years, Mr. Fuller and his family have lived near or below the federal poverty line. The older two daughters receive free lunches at school, and the family has been on food stamps and Medicaid. The mother of Mr. Fuller's oldest daughter owes him many thousands of dollars in child support arrears.

40.    Mr. Fuller has struggled with addiction to pain medication in the past. His addiction began when a doctor prescribed pain medication for Mr. Fuller's injuries from an accident, including broken bones. Mr. Fuller has been clean for ten months, and he attends Narcotics Anonymous meetings every other day.

41.    In 2015, a Santa Fe police officer stopped Mr. Fuller while he was driving through a school zone. Mr. Fuller had not been speeding, and in fact, he had been careful to reduce his speed to the school zone limit. The officer nonetheless pulled Mr. Fuller

over.  The officer noticed that Mr. Fuller had an expired inspection sticker, and wrote him a ticket for that.

42.    As opposed to other people, who could write a check to resolve their cases, Mr. Fuller could not afford to pay his fine outright.

43.    Mr. Fuller checked into a one-month inpatient rehabilitation program after he received his ticket. He was an inpatient during the court date for his traffic ticket.

44.    When Mr. Fuller checked out of the rehabilitation program, a warrant had not yet issued for his arrest. He asked the City Marshal about resetting his court date. The City Marshal told Mr. Fuller a time when he would be able to come to court and speak with the judge, and Mr. Fuller came to court.

45.    The Municipal Judge told Mr. Fuller that he had been charged with failure to appear, and Mr. Fuller was not allowed to contest the ticket. The judge required Mr. Fuller to pay the full amount of the failure to appear ticket in order to get on a payment plan.

46.    Mr. Fuller made the payment, though he had been planning on using that money to pay other bills, and the clerk handed him the papers to sign for his payment plan. Mr. Fuller told the clerk that he could not afford the monthly payments listed on the paper. The clerk told Mr. Fuller that if he missed a payment, a warrant would issue for his arrest. Mr. Fuller said he would do his best to make the payments, but he wasn't hopeful. The clerk told Mr. Fuller that if he could not make his payments, once a warrant issued, Santa Fe would jail him for failure to pay.

47.     Neither the Municipal Judge nor the clerk advised Mr. Fuller that, by signing the papers for a payment plan, he was pleading to criminal charges. Mr. Fuller felt that he had no alternative to signing the papers. He circled "no contest," but no one explained what that meant. The judge sentenced Mr. Fuller to a fine.

48.     Neither the Municipal Judge nor the clerk asked Mr. Fuller any questions about his ability to pay.

49.     Neither the Municipal Judge nor the clerk advised Mr. Fuller of his right to counsel. Mr. Fuller was not represented by counsel, nor did he waive his right to counsel.

50.     Mr. Fuller could not afford his first payment. The City Marshal came to Mr. Fuller's house, and told Mrs. Fuller that her husband would need to pay the fine, or else the City would jail him for failure to pay.

51.     Three days later, the City Marshal came back to Mr. Fuller's house as he was leaving for work. The marshal asked Mr. Fuller about his work schedule and other obligations, so the marshal would know where to track Mr. Fuller down if he didn't make a payment.  The marshal warned Mr. Fuller that he would lose his TWIC card, a $180 identification card required for his work at the shipyard, if the marshal arrested him at work.

52.     Mr. Fuller told the marshal that he could not afford to make a payment. The marshal said that Mr. Fuller's only option was to pay the fine; otherwise, the City would jail him for failure to pay. Realizing that jail was inevitable, Mr. Fuller offered to surrender himself at the jail that weekend.

53.     Mr. Fuller surrendered himself at the jail, as promised, that weekend. But the Municipal Court had made an error in court records. Mr. Fuller's file looked like a failure to appear case, and did not reflect the fact that Mr. Fuller had already appeared to answer the failure to appear charges and signed papers for a payment plan. The Police Department treated Mr. Fuller's case like a failure to appear case, and brought him before the Municipal Judge the next morning.

54.     The Municipal Judge fixed the recordkeeping mistake by ordering Mr. Fuller to sign a new set of papers for a payment plan and released him from jail.  When Mr. Fuller got home, he realized that his new payment plan was for even more money than he owed before.

55.     Mr. Fuller still could not afford his payments. Court clerks issued a capias pro fine warrant for Mr. Fuller's arrest. Mr. Fuller was hopeful that he would eventually save up enough money to start paying, but despite his best efforts, Mr. Fuller could not spare any money to pay toward his fines.

56.     About six months later, Mr. Fuller and his boss were out on business, driving a new truck the company had bought. The temporary tag was flapping in the wind. A state trooper pulled Mr. Fuller over because he could not read the tag.

57.     The trooper ran Mr. Fuller's license and contacted the Santa Fe Marshal about his capias pro fine warrant. The trooper handcuffed Mr. Fuller, and the marshal picked him up and took him to jail.

58.     Someone at the Santa Fe Jail told Mr. Fuller that he would be in jail for two days at most. But when Mr. Fuller's family called to ask about getting him out, his

mother, father, and wife each got different answers about how much money they would have to pay to get him out, and when he would be released. His family could not get enough money together to get Mr. Fuller out of jail.

59.     Each time Mr. Fuller was held in the Santa Fe Jail, Police Department staff booked him without asking him any questions about his medical needs or screening him for risk of suicide. Each time, his jail cell was unsanitary. The mattresses remained damp after prisoners sprayed them with cleaning products, and grew mold where they laid against with the metal bed underneath. There were mashed Pop Tarts crusted onto the mattresses.

60.     While Mr. Fuller was permitted to make phone calls, the phone he was allowed to use could not connect with a cell phone unless the recipient had already set up a prepaid account for use with the jail's phone company. When Mr. Fuller did connect with a landline, a conversation that lasted approximately one minute cost the recipient $48.

61.     Each time Mr. Fuller was held in the Santa Fe Jail, the prisoners were fed a maximum of one Pop Tart for breakfast, one Pop Tart for lunch, and a frozen dinner.

62.     On two different evenings, Police Department staff forgot to feed Mr. Fuller his frozen dinner. He was extremely hungry and he did not feel well.

63.     One of the nights when Mr. Fuller was deprived of food, he decided to try to get someone's attention around 3:00 AM, even though he was nervous that he would only make the staff angry. He started yelling, then knocking on the door, then kicking the door. He gradually got louder and kicked the door of his cell as hard as he could.

64.     Mr. Fuller kicked the door intermittently for about an hour. Because nobody was near the jail cells at night, and nobody was monitoring the video feed from the jail cells, it took that long for a staff member to realize that Mr. Fuller was trying to get someone's attention.

65.     After an hour of kicking, someone came to Mr. Fuller's cell and yelled at him for kicking the door. Mr. Fuller said he hadn't gotten any food for dinner. The staff member was annoyed that Mr. Fuller had made so much noise, so he put the frozen dinner in the microwave—which Mr. Fuller could see from his cell door window—and left the area for another hour. Eventually, the staff member came back and handed Mr. Fuller the food, which was cold.

66.     On Mr. Fuller's third day in jail, jail staff informed him that he had eight more hours to go. They told him that rather than sitting in jail for another eight hours, he could clean their offices and get out early. Mr. Fuller felt angry that he was being pressured to do cleaning for the Police Department, after having been in jail for three days, just because he didn't have the money to pay his fines. But he did the cleaning anyway because it was his fastest way out.

67.     Mr. Fuller was ultimately jailed by the Santa Fe Police Department for three days, in violation of his right to due process, right to equal protection, right to counsel, and right against cruel and unusual punishment.

IV.    **Plaintiffs Bring This Action Against the City of Santa Fe and Two City Officials**

68.    Defendant City of Santa Fe is a municipality organized under Texas law. Plaintiffs seek injunctive relief, declaratory relief, and damages from the City. The City may be served with process by serving the Mayor Jeff Tambrella, Secretary and Treasurer Janet Davis, or City Manager Joe Dickson (the Chief Executive Officer) at Santa Fe City Hall, 12002 State Highway 6, Santa Fe, Texas 77510.

69.    Defendant Carlton Getty is the Santa Fe Municipal Judge. Plaintiffs sue Judge Getty in his individual capacity, for declaratory relief only.

70.    Defendant Jeffrey Powell is the Santa Fe Police Chief. Plaintiffs sue Chief Powell in his official capacity, for injunctive and declaratory relief.

## CITY OF SANTA FE PRACTICES

I.    **The City of Santa Fe Unconstitutionally Jails Local Residents Under a Scheme to Raise Revenue**

A.    **The Santa Fe Municipal Court Assesses Fines in Unreliable Proceedings Lacking Basic Constitutional Protections**

71.    The City of Santa Fe's revenue-generating scheme begins with Municipal Court proceedings that lack even the most basic constitutional protections.  For a person who cannot afford to pay her fine, Santa Fe's criminal justice system is like a maze with dead ends at every turn.

72.     The Santa Fe Municipal Court's criminal jurisdiction is limited to tickets for Class C Misdemeanors. Class C Misdemeanors are defined by Texas law as "nonjailable," "fine only" offenses, punishable by a fine up to $500. They are the least

serious offenses punishable in the State of Texas, such as failure to signal while changing lanes.

73.     The Santa Fe Municipal Court permits anyone who can afford to write a check to exit the criminal justice system by pleading guilty and mailing the court payment in full. For most of us, that fine is a proportionate sanction for a minor offense.

74.     But for anyone who cannot afford to write a check, the stakes are much higher. For Santa Fe's poorest residents, the only way out of the system is jail.

75.     The City of Santa Fe simply ignores the constitutional prohibition on jailing people unless they were represented by counsel. The court does not appoint counsel to represent people who appear in court, nor does the court staff advise people who appear in court of their right to counsel.

76.     The vast majority of people who appear in Santa Fe Municipal Court cannot afford a lawyer, do not understand their right to counsel, and do not have the legal expertise necessary to establish their innocence. Deprivation of counsel is an affirmative defense to jail, but people who appear in court do not know that, because the City does not give people the chance to consult with a lawyer who would advise them of their rights. Court staff do not obtain a knowing, intelligent, or voluntary waiver of the right to counsel from any person in any proceeding.

77.     Indeed, the only guidance the court gives the public on the right to counsel creates the false impression that people who cannot afford a lawyer aren't entitled to one. In describing the accused's "rights," the City's website simply declares: "**No attorney will be appointed for you.**"

78.     As a result, anyone who cannot afford to pay her fine is disadvantaged by a dramatic imbalance of resources between the accused, who may be experiencing her first contact with the criminal justice system, and the City of Santa Fe, which has established a system for prosecuting more than a thousand Class C misdemeanor cases each year. For example:

  a.      The City employs a full-time City Attorney with training and experience in prosecuting Class C misdemeanors.

  b.      The Municipal Court shares resources with the City Attorney. The court clerks work for the City Attorney, serving as his administrative support.

  c.      Municipal Court staff train the City Attorney about changes in the law that pertain to the court.

  d.      The Court Administrator engages in direct, off-the-record communication with the City Attorney and Santa Fe Police Department staff to discuss modifying flawed tickets so a case is not subject to dismissal.

79.     The Santa Fe Municipal Court also ignores the constitutional requirements for accepting guilty and no contest pleas, which must be knowing, intelligent, and voluntary. Court staff simply instruct anyone who cannot afford to pay her fine to circle "guilty" or "no contest" on a payment plan form if she is not contesting her ticket. It is common for a person who completes that form to do so without understanding that she is pleading to criminal charges, that a judgment of conviction will be entered against her, and that she is at risk of jail time if she cannot make the required payments. Santa Fe Municipal Court staff do not engage in the colloquy that is ordinarily necessary for a

knowing and intelligent guilty or no contest plea, which would require the Municipal

Judge to ask the accused questions and satisfy himself that:

      a.    The accused understands nature of the charges against her and what

the government would have to prove to convict her of her charge.

      b.    The accused understands rights that she is waiving, including right to

plead not guilty, the right to a jury trial, the right to a presumption of innocence

unless the government proves her guilt beyond a reasonable doubt, the right to

confront witnesses against her, the right to compel witnesses to testify in her

defense, the right to remain silent or testify at trial, and the right against any

penalty for her silence.

      c.    The accused understands maximum legal penalties for her charge.

      d.    The accused is competent to enter a plea, is voluntarily making the

plea, and has not been induced to make the plea with any false representations or

improper promises.

80.    To make matters worse, the Municipal Judge allows budgetary

considerations to color his judgment about whether to dismiss cases. The judge recently

identified dozens of cases in which the prosecutor could not prove the charges against the

accused. The judge nevertheless declined to dismiss those charges, because of the

negative impact on overall fines owed to the City. If a person is arrested under an open

warrant in one of these cases, it is likely that the court will accept her no contest plea and

entered a conviction against her—despite the judge's knowing that the prosecutor would

be unable to prove his case.

81.     The Santa Fe Municipal Court ignores the constitutional requirement to offer reasonable alternatives, like community service or proportional fines, for the indigent. Instead, the court simply sentences people to pay fines, and enforces those fines by ordering anyone who cannot pay her fine to make payments in what can be unmanageable installments, generally $100 per month. The court does not determine the accused's ability to pay before setting the monthly payment amount. Court staff refuse to reduce the payment amount or offer any alternatives, even if someone says that she cannot afford the monthly payment.  This one-size-fits-all approach makes it inevitable that poor people and low-income workers will be unable to satisfy the requirements to exit the criminal justice system.

82.     The Santa Fe Municipal Court makes failure even more likely by imposing extra fees on anyone who cannot afford to pay her fine. The base fine for a single offense, combined with fees and costs mandated by both the City of Santa Fe and the State, is typically between $200 and $500.[1] For anyone who cannot afford to pay her fine outright, her debt for a single ticket will continue to grow: a fee is added for a payment plan; yet another fee if she misses a payment and the court issues a warrant; more fees are added if the court refers her ticket to a debt collection agency. The Santa Fe Municipal Court does not waive any of these fees in any case.

---

[1] Throughout this complaint, Plaintiffs use the term "fine" to refer to this total debt to the court: the base fine plus costs and fees associated with each ticket.

83.     The City of Santa Fe also takes steps that increase the likelihood that a person who cannot afford her fine will receive additional tickets and incur still more fees and costs. The City contracts with the Department of Public Safety to report unpaid fines to the state, resulting in an additional fee for each unpaid fine—a portion of which goes to the City—and preventing anyone with unpaid fines from renewing her driver's license. The City also reports unpaid fines to the Department of Motor Vehicles, resulting in even more fees and prohibiting anyone with unpaid fines from renewing her car registration. A person in this situation is likely to lose her car insurance, because her premiums will become unaffordable (or her coverage will be dropped altogether) due to her expired driver's license.

84.     Because Santa Fe lacks meaningful public transportation options, a person living in poverty is put to a difficult choice. If she stops driving, she may lose her job or be unable to meet family obligations. But if she drives, her expired car registration increases the likelihood of additional traffic stops, where officers write new tickets for the expired license, expired registration, and lapse in car insurance. It is not uncommon for someone with low income to accrue $1000 or more in fines in a short period of time.

85.     Despite having created these obstacles for poor people trying to satisfy their legal obligations, the Santa Fe Municipal Court enforces these fines by summarily issuing a capias pro fine warrant for anyone who fails to make timely payments in full. Court clerks issue capias pro fine warrants in the Municipal Judge's name. The face of the warrant indicates that it is a capias pro fine warrant, and explicitly states that the basis for the warrant is failure to pay a fine.

86.     Even people who do manage to make their payments are not protected from the court's harsh enforcement practices. The court's recordkeeping system invites mistakes, and court clerks issue capias pro fine warrants in error. Court clerks record pleas and judgments of guilt on forms without other identifying information, such as the date of the offense, citation number, or offense charged. Court clerks also record outstanding balances with handwritten notations in two different places, resulting in confusing and inconsistent records of payment already made.  Balances increase and decrease with notations that are insufficient to adequately explain changes in the outstanding fine, or to memorialize communication between the person who owes money and the court.

87.     This historically poor recordkeeping has led to systemic problems with issuing convictions and warrants in error, keeping even those who comply with the court's orders ensnared in the Santa Fe criminal justice system. In recent cases, the court has incorrectly entered convictions for people who successfully completed a deferred disposition, and incorrectly issued warrants for people who appeared in court and paid their fines—even for people who received a mere warning, rather than an actual ticket.

88.     The court's recordkeeping problems persist: one of the "operational objectives" for the Santa Fe Municipal Court in the 2015–16 fiscal year is to "[c]ontinue clean-up and maintenance of court database."

89.     Whether warrants are issued as the result of a recordkeeping error or not, court clerks typically issue capias pro fine warrants without prior notice, catching people off guard and triggering harsh procedural rules that put them at further disadvantage.

21

Internal court rules specify that the clerks "may or may not" give the person subject to the warrant a "courtesy" phone call. When court staff do make a courtesy call to warn a person about her capias pro fine warrant, and that person asserts inability to pay, officials simply instruct her to come up with the money lest she be arrested and jailed.

90.     The capias pro fine warrants issued by court clerks purport to authorize an unconstitutional term in debtors' prison. The warrants direct officers to either bring the person who owes money before the court immediately, or "place [the person] in jail until such time as [s/he] pays the amount due on said judgment and the further costs of collecting the same or until [s/he] is otherwise legally discharged."

91.     Court clerks issue these warrants without giving people a chance to explain themselves to a judge and keep themselves out of jail: there is no predeprivation hearing inquiring into the reasons for the person's failure to pay. The Municipal Judge does not make any finding that the person has willfully refused to pay, that the person failed to make sufficient bona fide efforts to acquire the resources to pay, or that alternative measures are inadequate to satisfy the state's interest in punishment.

92.     Court clerks also issue these warrants to enforce fines in complete disregard of the constitutional right to counsel. The warrants purport to authorize a jail term for people who have not had the opportunity to consult with a lawyer. There is no other explanation that would make these jail terms constitutional: the court does not initiate charges for civil or criminal contempt. Court clerks do not limit the authorized period of detention to three days or less. And court clerks issue these warrants without giving

people a fair opportunity to present information about their ability to pay or object to the absence of court findings about their ability to pay.

93.     What counsel would assert, if counsel were appointed, is that these capias pro fine warrants purport to authorize jail terms far beyond the limited liberty deprivation authorized for capias pro fine warrants under Texas law. The only liberty deprivation Texas law authorizes for failure to pay is a capias pro fine warrant directing officers to bring the person before an appropriate court immediately, or if that is impossible, to hold her in jail until the next business day. Tex. Code Crim. Proc. Art. 45.045. Because Santa Fe's capias pro fine warrants authorize a more serious liberty deprivation, the warrants are unlawful and facially invalid.

94.     In short, for a person who cannot afford to pay her ticket, all routes through the Santa Fe Municipal Court lead to one outcome: a capias pro fine warrant. These warrants give officers a choice: either bring the person before the court, or jail her in violation of her right due process, her right to equal protection, and her right to counsel. Once the choice is in the hands of the Santa Fe Police Department, the Department consistently chooses an unconstitutional jail term.

**B.     The Santa Fe Police Chief Jails Local Residents Under Fundamentally Unfair and Uncivilized Conditions**

95.     As set forth above, people who cannot afford to pay their fines in Santa Fe Municipal Court are inevitably subject to a capias pro fine warrant. Once a capias pro fine warrant issues, the Santa Fe Police Department prevents any exit from the system except through a jail cell.

96.     The City makes this system clear to the public. In a section entitled

"Warrants," the City of Santa Fe website states:

> If you have a Capias Pro-Fine warrant, your options are:
> - Pay in full.
> - You may turn yourself in at the Santa Fe Police
>   Department located at 3650 FM 646 N, Santa Fe, TX
>   77510.

97.     The capias pro fine enforcement system is not passive. In addition to taking

custody of people who choose to turn themselves in, Santa Fe law enforcement officers

(both police officers and the City Marshal) actively search for people subject to capias

pro fine warrants, sometimes arresting people at their homes in front of family, friends,

and neighbors.

98.     In fact, the City has taken many affirmative steps to leverage a credible

threat of arrest in order to coerce payments from people who are subject to capias pro fine

warrants. The City Marshal has a stated "operational objective" to carry out an

"aggressive program of serving and collecting warrants."

99.     The City of Santa Fe also participates in the so-called "Great Texas

Warrant Round-Up," which is an annual campaign during which people subject to open

capias pro fine warrants are warned that they must make a payment to avoid being

arrested. Santa Fe police officers who would normally focus on other public safety duties

devote their time to finding and arresting people who cannot afford to pay their fines. The

Round-Up is timed to coincide with the period when people receive their tax refund

checks, such as the Earned Income Tax Credit for low- and moderate-income working

families.

100.    The City of Santa Fe is also a full-access participant in the Southeast Texas Crime Information Center, an organization that feeds data on capias pro fine warrants to participating law enforcement agencies in the area, and gives those agencies a financial reward for arresting anyone subject to a Santa Fe capias pro fine warrant. The City Marshal will travel up to a hundred miles from Santa Fe to take custody of anyone arrested under a capias pro fine warrant.

101.    When a Santa Fe law enforcement officer takes custody of a person under a capias pro fine warrant, the officer has the option, consistent with the language of the warrant, to bring the person before the court immediately. But Santa Fe law enforcement officers do not bring the person before the court, immediately or otherwise.

102.    Instead, Santa Fe law enforcement officers transfer anyone arrested under a capias pro fine warrant to the custody of the Santa Fe Police Chief and book her into jail. The Police Chief refuses to release anyone arrested under a capias pro fine warrant unless either she pays her fines in full, or the Department holds her in jail long enough to satisfy her fines with "jail credit." This practice of enforcing fines turns the Santa Fe Jail into a modern-day debtors' prison, and it is unconstitutional.

103.    This practice is unconstitutional because people are jailed for failure to pay without a hearing. The Santa Fe Police Chief prohibits people in his custody from speaking to a judge to explain why they failed to pay and ask for an alternative to jail. The Chief jails people for failure to pay in the absence of judicial findings that they willfully refused to pay, that they failed to make sufficient bona fide efforts to acquire the

resources to pay, or that alternative measures are inadequate to satisfy the state's interest in punishment.

104.    These jail terms are also unconstitutional because the people who are jailed don't get the opportunity to consult with a lawyer. City policymakers including the Police Chief are aware that people arrested under capias pro fine warrants are highly unlikely to have been represented by an attorney at trial, because the City designed its criminal justice system to elicit guilty pleas without appointing defense counsel or advising people of their right to counsel. While anyone who was unrepresented at trial could theoretically assert the deprivation of counsel as an affirmative defense to jail, people arrested under capias pro fine warrants do not understand or exercise this right, precisely because they are deprived of counsel to advise them of the right in the first place. Instead, the Police Department jails people without informing them of their right to counsel, taking any steps to appoint counsel in their defense, or obtaining a knowing, intelligent, or voluntary waiver of the right to counsel.

105.    Finally, these jail terms are unconstitutional because they are imposed without a facially valid court order or any other legal justification. Texas law requires officers to take people subject to a capias pro fine warrant before an appropriate court as soon as possible, and no later than the next business day after arrest. But the Police Chief jails people for days, regardless of whether a court appearance is possible. These jail terms violate due process of law because they have no legal justification.

106.    The Police Chief's constitutional violations are compounded by the fact that it is impossible for people to assert their constitutional rights in state court. People

subject to an open capias pro fine warrant are prohibited from setting an appearance date in Municipal Court, so it isn't possible to raise these claims prior to arrest. And after arrest, the jail term for failure to pay is too short to permit litigation of a habeas corpus petition in state court. People who the Chief holds in jail cannot vindicate their constitutional rights and invalidate their jail terms before their release.

107.    Procedural and substantive unfairness aside, the jail terms imposed by the Santa Fe Police Chief are also unconstitutional because they are cruel. In an attempt to coerce payments, the Police Chief denies people in his custody basic human needs such as food, medical care, and protection from serious harm.

108.    The Police Chief compromises his prisoners' safety by locking them in jail cells without any meaningful supervision in case of an emergency. There are cameras in the jail cells, but staff do not consistently monitor the video feed. If it so happens that no one is close enough to the cells to hear a prisoner call for help—or if a prisoner is incapable of calling for help—no one will know that there is an emergency.

109.    Through denial of medical care, the Police Chief also compromises prisoners' health and safety. The Chief authorizes his staff to lock people in jail cells without any screening for medical needs or suicide risk during the jail booking process. He does not provide a way for anyone in his custody to speak with a medical professional. Even if someone tells Police Department staff that she requires specific medications, the Chief refuses to provide those medications, unless the person in jail can prove that she already has a prescription. For someone who was arrested without notice, this is almost always impossible to do.

110.    Finally, the Police Chief denies people the basic necessity of food. He jails people on a diet of no more than one Pop Tart for breakfast, one Pop Tart for lunch, and frozen meal, such as a Hungry Man frozen dinner, at night. The Police Chief apparently considers one box of Pop Tarts to be adequate to feed anyone in his custody breakfast and lunch for four days straight.

111.    This diet is nutritionally and calorically deficient. While the Chief varies the flavor of Pop Tart and the type of frozen meal provided to people in his custody, the diet is always calorically and nutritionally insufficient for an adult, even a sedentary adult.

112.    For example, during October 2016, the Police Chief has been feeding people in his custody Pop Tarts and a frozen meal amounting to 720 calories a day. A 720-calorie diet supplies less than half of the calories any sedentary adult requires, and less than a third of the calories sedentary young men require. A 720-calorie diet is not even enough to feed a one-year-old child.



113.    This starvation diet would be bad enough on its own, but the food

deprivation gets even worse. The Police Chief has not established a system for alerting

on-duty supervisors that a person has been booked into the jail under a capias pro fine

warrant, creating a high risk that people in his custody will be deprived of the little food

they are supposed to receive, because no one knows they are in the jail.

114.    And even when Police Department staff do know that someone has been

booked into the jail, the Police Chief has not established a system for ensuring that they

get fed. Over the past two years, Police Department staff have repeatedly deprived people

in their custody of "meals" they are supposed to receive—simply failing to distribute any

food at all.

115.    These jail conditions coerce people to pay money they cannot afford to part

with—such as money for food or medicine—in order to buy their liberty. Some people

make frantic calls to family or friends, asking them to gather whatever money they can

and turn it over to the police. But for a person who simply does not have access to the money to pay, the Santa Fe Police Chief jails her under fundamentally unfair and uncivilized conditions, solely because she cannot afford to pay her fines.

## II.  The City of Santa Fe is Liable for Jailing Local Residents in Violation of Their Constitutional Rights

### A.  The Santa Fe Police Chief Jails People Under Two Unconstitutional Policies

116.  The practices described in the foregoing section are not anomalies; they are the persistent and widespread practices of municipal officials handling capias pro fine warrants in the City of Santa Fe. These practices are so common and well-settled that they fairly represent customs that constitute two distinct municipal policies.

117.  The first policy is the Debtors' Prison Policy. As discussed in Section I.B above, the Santa Fe Police Department has a persistent, widespread, and well-settled practice of jailing people under capias pro fine warrants in violation of their constitutional rights. Specifically, police officers do not present people to a judge for an ability to pay hearing. Police officers jail people for uncounseled misdemeanor convictions without advising them of their right to counsel or taking any steps to appoint counsel. And police officers refuse to release a person from jail until she has stayed in custody long enough to discharge her fines, which is often longer than the next business day after her arrest. Moreover, the Santa Fe Police Chief does not train his officers in application of constitutional rights in the context of capias pro fine warrants, such as the right to due process, the right to counsel, and the scope of the liberty deprivation a capias pro fine warrant authorizes under Texas law.

118.    The second policy is the Hungry Man policy. As discussed in Section I.B above, the Santa Fe Police Department has a persistent, widespread, and well-settled practice of jailing people on a diet of one Pop Tart for breakfast, one Pop Tart for lunch, and a frozen meal, such as a Hungry Man meal, for dinner. The Police Chief does not assign responsibility for feeding people in his custody, and he does not supervise the distribution of food, despite repeated instances of his staff forgetting to feed the people locked in jail. These deprivations of food are not episodic omissions, but rather the repeatedly occurring symptom of systemic deficiencies in the Police Chief's delegation of power and supervision of his staff who operate the Santa Fe Jail.

119.    Many aspects of the Police Department's operations demonstrate that these practices are municipal policy. For example, the forms used by the Police Department evince the persistent, widespread, and well-settled nature of the Debtors' Prison Policy. There are only two types of paperwork available for documenting the execution of a capias pro fine warrant: a receipt, which is issued for payment, or a "Jail Time Credit" form, which is issued by the Police Department, if at all, after the Department jailed the person long enough to discharge her fine. Police Department staff do not complete any paperwork on a person held in jail until after she has already been held in jail long enough to satisfy her fine. In the words of a supervisor, officers document arrests on paperwork "[s]ometimes, if we are lucky." A Police Department supervisor gathers the paperwork that officers bother to complete on Monday morning—after the relevant decisions about jail release have been made—and transfers the paperwork for recordkeeping after the fact. It is clear that Police Department staff determine whether

31

and when to release a person from the Police Chief's custody, based solely on the amount of money she owes.

120.    The Debtors' Prison Policy is so persistent, widespread, and well-settled that, when the Municipal Judge goes on vacation, Police Department staff do not make any contingency plans for presenting people who are arrested under a capias pro fine warrant to a judge. This is because Police Department staff do not present such people to a judge in the ordinary course of business.

121.    The Police Department's structural capacity to clear capias pro fine warrants shows that the Debtors' Prison Policy is persistent, widespread, and well-settled. The Police Department has established a framework for accepting payments toward outstanding fines and clearing capias pro fine warrants from the court's database after payment or jail time—all without consulting a judge.

122.    The Municipal Court's self-reported data also show how persistent, widespread, and well-settled the Debtors' Prison Policy is.[2] From September 2015 through August 2016, the City of Santa Fe reported that it satisfied 221 cases with jail credit. During the same period, the City allowed a full satisfaction of a fine with community service in just one case, and did not waive any fines in any case—not even

---

[2] The Court should regard data reported to the Office of Court Administration before September 2014 with skepticism. On September 2, 2014, the Court Administrator emailed the City Manager to notify him that the Municipal Court had not been reporting data accurate data to the Office of Court Administration, and she would do her best to report data accurately going forward.

one dollar—due to the inability to pay. This is because the Police Department does not present people to the judge for hearings concerning ability to pay or alternatives to jail.

123. The Santa Fe Police Department's public records support the same conclusion. There is only one written Police Department procedure that applies to capias pro fine warrants specifically. The procedure gives a person arrested under a capias pro fine warrant three options: "Pay fine," "Sit out time in jail (100.00 per day (24 hrs) per charge)," or a combination of the two. Police Department staff have no written procedures concerning producing a person for an ability to pay hearing, informing her of her right to counsel and taking steps to appoint counsel, or any time limit on her detention other than the amount of money she owes to the court. The Santa Fe Police Department does not have any training materials or training policies concerning execution of capias pro fine warrants.

124. It's also clear that from Santa Fe Municipal Court records that the Debtor's Prison Policy is persistent, widespread, and well-settled. The Municipal Court simply does not have any of the forms it would need to enforce fines for Class C Misdemeanors in a constitutional manner:

     a. The court lacks application forms for payment plans, community service, indigency status, waiver or reduction of fines, or clearing arrest warrants.

     b. The court has no policies, procedures, standing orders, rules or other guidance to the City Marshal concerning execution of capias pro fine warrants.

     c. The court has not developed training materials or training policies for the City Marshal concerning execution of capias pro fine warrants.

      d.     The court's case files show that the Municipal Judge did not sign a single order committing a person jail during a four-month period from December 1, 2015 through mid-April 2016. Over that same period, the Police Department jailed many people who were arrested under capias pro fine warrants.

      e.     The court files lack evidence of ability to pay determinations for anyone arrested under a capias pro fine warrant from January 1 through June 23, 2016. Over that same period, the Police Department jailed many people who were arrested under capias pro fine warrants.

125.    Just like the Debtors' Prison Policy, the Hungry Many Policy is also a municipal policy. The Police Chief has failed to promulgate any policies regarding supervisory use of the information recorded in the Jail Management System (JMS), where police department staff are supposed to record each "feeding." The Chief has not implemented any alert for when a "feeding" is not recorded, nor has he designated any supervisor to systematically check JMS to see whether a person in his custody was fed. The result is that, though the Chief is in possession of records showing whether or not people in the jail were fed, he is not using those records in a preventative way to ensure that someone does, in fact, feed the people in his custody.

126.    The risk posed by this policy failure isn't just theoretical. People in the Police Chief's custody have been deprived of food repeatedly due to his failure to supervise his staff.

127.    For example, on August 16, 2016, City officials realized that someone arrested under a capias pro fine warrant had not been fed for some time. The mistake was

fixed only because, one morning, the person who had been arrested got the attention of the City Marshal and convinced him that she had not been fed.

128.   From the time that person had been booked into jail, there were no jail checks or "feedings" logged in for her. It is not clear whether the she had been fed at all for the duration of her jail term. The Police Department supervisor on duty was completely unaware that this person had been booked into the jail.

129.   When this issue was brought to the attention of Santa Fe's Lieutenant, one of the Police Department's top officials, he said that no one should "nitpick" about whether people in the Chief's custody are fed or not. The Lieutenant did not demonstrate any concern about the fact that a person locked in the jail had been deprived of food. Instead, he defended the Police Department's actions.

130.   After this incident, there is still confusion among City officials about who is responsible for feeding someone booked into jail under a capias pro fine warrant. On August 16, 2016, the Police Chief was explicitly warned that "we need to confirm if [the City Marhsal] is responsible for feeding his prisoner or will his prisoner be fed with everyone else." The Police Chief has not taken any action to address this problem.

131.   A diet of two Pop Tarts and a frozen meal per day, less the "meals" missed when Police Department staff are busy or inattentive, is an objectively sufficiently serious deprivation of the calories and nutrition necessary to sustain a healthy adult—it is a starvation diet. Enough food to maintain health is a minimal civilized measure of life's necessities. The Hungry Man Policy results in cruel and unusual punishment.

**B.**     **Santa Fe's City Council, City Manager, and Police Chief Are Each Municipal Policymakers**

132.    The City of Santa Fe is liable for the Debtors' Prison Policy and the Hungry Man Policy through its municipal policymakers.

133.    The City of Santa Fe is a home rule city, meaning that as a matter of Texas law, the local government is free to establish any system of policymaking authority not prohibited by the State. Santa Fe's Home Rule City Charter designates its form of government as a "Council-Manager Government."

134.    The City Charter vests general policymaking authority in the City Council, which consists of the Mayor and five councilmembers. The Mayor is the head of the City Council.

135.    The City Charter vests general executive, administrative, and supervisory authority in the City Manager. This authority entails the power to set policies regarding training and supervision of City employees. By ordinance, the City Council has created the Santa Fe Police Department, subject to administration and supervision by the City Manager.

136.    The City Council has also impliedly delegated final authority to set policy regarding all Police Department operations, including operation of the jail, to the City Manager. The City Council has not explicitly authorized establishment of a jail or set any policies whatsoever concerning jail operations. The City Council has not exercised any oversight of jail operations for the entirety of the Council's history, not even during or after the recent construction of a new multimillion-dollar facility. The City Council has

never commented authoritatively on operation of the Santa Fe City Jail. The City Council does not exercise any supervisory power over policies concerning the Police Department. Instead, the City Council has delegated policymaking authority for Police Department operations to the City Manager.

137.    In an exercise of the authority delegated to him by the City Council, the City Manager expressly delegated final authority to set policy regarding all operations of the Police Department to the Police Chief. Among the "essential job functions" that the City Manager has delegated to the Police Chief are: "Direct and coordinate the work of all divisions of the police department," "develop[] and review [] policies and procedures," "[be] responsible for long and short range planning for the department," and "establish departmental performance goals." These are classic functions of a municipal policymaker. The Police Chief has recently used this authority to promulgate many final policies governing operation of the Santa Fe Police Department, such as the Department's policy on racial profiling, and the policy on towing cars during a traffic stop.

138.    The communication (or lack thereof) regarding the Police Chief's policymaking further suggests that the Chief's policymaking authority is final. No one, including the City Manager, Mayor, and other City Councilmembers, exercises review or oversight of the Police Chief's policymaking authority, or makes any authoritative commentary about the policies the Police Chief promulgates. Instead, the Police Chief notifies officials outside the Police Department of a change to Departmental policies—if at all—after the change is implemented, with messages such as "Just an FYI."

139.   In the alternative, the Santa Fe City Council is the policymaker with respect to rules of procedure and practice in the Municipal Court, which entails rules governing appointment of counsel, entry of guilty pleas, jail commitment orders, and access to the court. The City Code explicitly reserves unsupervised, final authority to promulgate policies governing Municipal Court procedures to the City Council. For example, the City Council annually implements a warrant amnesty program, requiring the Municipal Court to dismiss certain charges in exchange for payments. The City Council has also passed ordinances prescribing detailed procedures for the court regarding cash bail, such as the exact conditions a person must agree to in order to post bail, the minimum amount of bail, and how to issue and store receipts for bail.

### C.   Santa Fe's Municipal Policymakers Implemented the Debtors' Prison Policy

140.   As described in section II.A above, the Debtors' Prison Policy is a persistent, widespread practice of Santa Fe Police Department staff, which is so common and well  settled as to constitute a custom that fairly represents municipal policy.

141.   City Council members, including the Mayor, know of the Debtors' Prison Policy.

a.   The Court Administrator makes a monthly report to the City Manager and City Council. This report focuses exclusively on revenue generated or lost by the court, not the administration of justice. The report includes statistics on the "value," in dollars, of fines for which police department staff have imprisoned people for failure to pay.

b.      The City Council has publicly boasted about the number of warrants that the Police Department serves.

c.      The Mayor has served as a relief magistrate at the Santa Fe Jail when the Municipal Judge was unavailable, magistrating people arrested on higher charges before they were brought to the Galveston County Jail. The Mayor saw firsthand that the Police Department holds people in the Santa Fe Jail 24 hours for every $100 they owe, without presenting them to a judge for an ability to pay hearing or vindication of their right to counsel.

d.      The Mayor got upset and expressed disapproval when he learned of an outlier incident when the Debtors' Prison policy was not followed. The Mayor contacted Police Department officials and the Municipal Judge about how they could "correct" the mistake of releasing people from jail who haven't paid their fines.

142.   The City Manager has implemented the Debtors' Prison Policy.

a.      The City Manager knows of arrangements that Police Department and Municipal Court staff make when the Municipal Judge goes on vacation. Police Department staff make arrangements for presenting all types of people in custody to a judge, except people arrested under a Santa Fe capias pro fine warrant.

b.      The City Manager knows that the Mayor has expressed disapproval that the Debtors' Prison Policy was not followed, and that the Mayor contacted

Police Department officials and the Municipal Judge to discuss ways to ensure that the policy is followed in the future.

143.   The Police Chief has implemented the Debtors' Prison policy. The current Police Chief, Defendant Chief Powell, was appointed as of August 1, 2016. He was trained in all aspects of the Debtors' Prison Policy as carried out by his predecessor, including conditions under which people are released from jail, and paperwork to complete when releasing a person from jail. Since taking command of the Santa Fe Police Department, the Police Chief has reviewed other departmental policies and chosen to change at least one policy because it was unlawful. The Police Chief knows of the Debtors' Prison Policy, he has the power to change it, and he has failed to do so.

144.   Even if the City Council, City Manager, and the Police Chief did not have actual knowledge of the Debtors' Prison policy, they have constructive knowledge of the policy.

a.   The Debtors' Prison Policy is applied regularly. The Santa Fe Police Department takes custody of people under capias pro fine warrants, and jails them if they cannot pay their fines, multiple times a week.

b.   Police Department staff flagrantly carry out the Debtors' Prison Policy.

i.   Police Department staff carry out an interdepartmental exchange of forms that are tailor-made for the policy. After the Police Department jails a person for failure to pay, staff complete a "Jail Time Credit Form" and turn it over for recordkeeping—after the fact—that the

40

Police Department arrested and jailed a someone for failure to pay her fines.

ii.     Police Department staff have posted crucial components of the Debtors' Prison policy in the jail booking area. The Department's written procedure for jail releases includes just three options for releasing a person arrested under a capias pro fine warrant: release her after she pays her fine in full, after jailing her at a rate of 24 hours for every $100, or after she pays whatever money she can get her hands on, and she stays in jail long enough to make up the difference.

c.     Under the Debtors' Prison Policy, Police Department staff commit a severe constitutional violation. The Police Department subjects people who cannot afford their fines to imprisonment—a deprivation of physical liberty—for days on end. Freedom from imprisonment lies at the heart of the interests protected by the right to due process and the right to counsel.

d.     Both the City Council and the City Manager have been aware of overcrowding at the jail for years. As early as 2012, the City Council and the City Manager were presented with reports that "The [jail] cells are designed to accommodate two prisoners per cell. More often than not we have at least four people in each cell, requiring at least two per cell to [sleep] on the floor." Over the course of the next two years, the City undertook repeated initiatives to raise the money necessary to increase the capacity of the jail. A policymaker exercising his

responsibilities would investigate drivers of the incarceration rate at the jail and consider ways to reduce the jail population.

     e.     For years, there has been an ongoing national conversation illegal enforcement of fines in municipal courts. The U.S. Department of Justice has been especially vocal in this conversation, most significantly in its 2014–2015 investigation and report on the Ferguson Police Department, its December 2015 and September 2016 national convenings on criminal justice debt, and its March 2016 Dear Colleague letter condemning practices such as the Debtors' Prison Policy. Here in Texas, there has been considerable discussion among the Texas Judicial Council, the Texas Municipal Courts Education Center, state lawmakers, legal scholars, and criminal justice advocates regarding the legality of widespread practices such as Debtors' Prison Policy. A 2015 investigative report by Buzzfeed revealed that municipal judges across Texas routinely ignore protections for low-income people charged with Class C Misdemeanors. This report prompted the Texas Judicial Council to pass regulations reforming collections practices in municipal courts. Litigation and settlements over practices similar to the Debtors' Prison have developed in Alabama, Colorado, Georgia, Louisiana, Michigan, Mississippi, Missouri, New Hampshire, and Washington, and here in Texas in Amarillo, Austin, El Paso, McAllen, and Tyler. For any municipal policymaker who oversees a local jail or municipal court, proper exercise of his responsibilities would require a basic inquiry into whether the jail or court he oversees commits

the common constitutional violations that are the subject of statewide and national scrutiny.

145.    In short, the Debtors' Prison Policy is not a hush-hush agreement among low-level Police Department staff, nor is it a policy that the Police Department applies on rare occasions. The constitutional violations the Police Department causes under this policy are not trivial, and they are not highly technical or obscure. The Police Department is openly jailing people, with no legal recourse, just because they are poor.

146.    The City Council, City Manager, and Police Chief all know of the Debtors' Prison Policy. Their failure to train police officers about application of the rights to due process, equal protection, and counsel following arrest under a capias pro fine warrant evinces deliberate indifference to the constitutional rights of people held under these warrants in the Police Chief's custody.

147.    In the alternative, the City Council is responsible for failure to promulgate rules of practice and procedures in the Municipal Court that would remedy the persistent constitutional violations that result from the Municipal Court's capias pro fine warrants. The City Council has the power to stop the Municipal Court from issuing capias pro fine warrants that purport to authorize unconstitutional jail terms, the power to prohibit jail terms for convictions entered against people who didn't have the help of a lawyer, and the power to require ability to pay hearings before any deprivation of liberty for failure to pay. Yet the City Council has failed to exercise these policymaking powers in the face of hundreds of unconstitutional jail terms.

**D.     Santa Fe's Municipal Policymakers Implemented the Hungry Man Policy**

148.     As described in section II.A above, the Hungry Man Policy is a persistent, widespread practice of the Santa Fe Police Department, which is so common and well-settled as to constitute a custom that fairly represents municipal policy.

149.     The City Council, City Manager, and Police Chief know of the Hungry Man Policy.

150.     The City Manager is intimately familiar with the Police Department budget. The Police Chief reports detailed budget line item justifications to the City Manager, and the Mayor and City Council approve the budget annually.

151.     The City of Santa Fe's projected spending on jail supplies, for the most recent year for which that statistic is available, was $1500.00 per year. Even if the entirety of this budget went toward food, Santa Fe limited the total spending on food for all people in the Chief's custody to just $4.11 per day. This is only slightly more than the City's projected spending on supplies for dogs in the Police Department's canine unit, which was $3.84 per day.

152.     The Police Chief implements the Hungry Man policy. The current Police Chief, Defendant Chief Powell, was appointed as of August 1, 2016. He was trained in all aspects of the Hungry Man policy as established by his predecessor, including the diet his employees feed to people in his custody, and the system (or lack thereof) for ensuring they receive their food. Since taking command of the Santa Fe Police Department, the Chief has reviewed other policies and chosen to change at least one policy because it was

unlawful. The Police Chief knows of the Hungry Man Policy, he has the power to change it, and he has failed to do so.

153.    Moreover, the Police Chief allowed a person in his custody to be deprived of food as recently as mid-August. He knows that the failure to supervise officers and promulgate policies for feeding people in his custody poses a substantial risk that people would not be fed at all. The Chief has not changed any aspect of the Hungry Man Policy.

154.    Even if the City Council, City Manager, and the Police Chief did not have actual knowledge of the Hungry Man policy, they have constructive knowledge of the policy.

    a.    The Hungry Man policy is applied multiple times a day to every person locked in the jail.

    b.    The Hungry Man policy is applied flagrantly. There is no sign that Police Department staff do anything to conceal the Hungry Man Policy. The Police Chief was explicitly trained in this policy when he was hired. The "meals" for people in the Chief's custody are stored and microwaved in the same area where Department staff cook their own food and take breaks. Upper-level supervisors have described objections to food deprivation as "nitpicking," and generally defended the current system rather than trying to conceal it.

    c.    The severe nutritional and caloric deprivation resulting from a daily diet of two Pop Tarts and one frozen dinner is obvious, whether or not a policymaker takes the time to check the nutritional label. The diet fed to people in the Chief's custody is a starvation diet that provides less than half of the caloric

and protein requirements for an adult of any age or sex. For a person who is already living on this diet for days, deprivation of even one "meal" is a severe deprivation of food that would be apparent to any policymaker fulfilling his oversight responsibilities.

        d.     As alleged above, the City Council, City Manager, and Police Chief approve spending for prison supplies that barely exceeds spending on supplies for the Police Department's dogs. The Police Chief is aware that at least one person in his custody was recently deprived of food.

155.    Like the Debtors' Prison Policy, the Hungry Man Policy is not a hush-hush agreement among lower-level Police Department staff, nor is it a policy that the Police Department imposes on rare occasions. The constitutional violations the Police Department causes under this policy are not trivial, and they are not highly technical or obscure. The Police Chief is not giving people in his custody enough food to stay healthy.

156.    The City Council, City Manager, and Police Chief all know of the Hungry Man Policy. By failing to adequately supervise the distribution of food to people in the Chief's custody, they are deliberately indifferent to the high risk that people will be deprived of the minimal civilized measure of life's necessities.

## III.    The City of Santa Fe Has Conspired to Deprive Local Residents of their Constitutional Rights

157.    Through its policymakers, the City of Santa Fe has agreed to use its law enforcement powers as a means to generate revenue for the City. The City Council, City Manager, Police Chief, Court Administrator, and Municipal Judge have agreed to deny

constitutional rights as part of a broader scheme to maximize revenue generation by coercing people to make payments they cannot afford. These officials have all agreed that that the purpose of collecting outstanding fines is not to administer justice, but to use intimidation to generate revenue. These officials have agreed to intimidate people into making payments by systemically violating their right to due process, right to equal protection, right to counsel, and right against cruel and unusual punishment.

158.    The City Council, City Manager, Police Chief, Court Administrator, and Municipal Judge have had explicit discussions about assessing and enforcing fines to make up for a budgetary shortfall. Last summer, the City Manager scheduled a meeting with officials including the Court Administrator and Police Chief to brainstorm ways to make up for a budgetary shortfall of nearly $650,000.

159.    Shortly after the meeting about the budgetary shortfall, the Municipal Judge raised the fines for all tickets written by the Santa Fe Police Department, requiring people to pay even more money to extricate themselves from cycles of contact with the Santa Fe criminal justice system. The City Manager knew of this change in advance and had a conversation with the Court Administrator about whether the City Council would need to approve it.

160.    In the year following the meeting about the budgetary shortfall, court clerks nearly doubled the number of capias pro fine warrants they issued to enforce fines by authorizing the Santa Fe Police Department to jail people for failure to pay.

161.    In the year following the meeting about the budgetary shortfall, the Municipal Court tracked and proudly reported monthly increases in revenue. In one

month, the court reported increased revenue by 75% over the same month in the previous year. Court staff also proudly reported that they had improved their collections by placing more phone calls to people with unpaid fines. During these phone calls, court staff threaten people with unconstitutional jail terms if they fail to make a payment.

162.    As a result of the concerted effort among the Municipal Judge, Court Administrator, City Council, City Manager, and Police Chief, the revenue the Municipal Court generated for the City increased by $20,045 over the previous year, to a total of $225,562.

163.    These are only the most recent steps in furtherance of an ongoing agreement to deprive people of their constitutional rights as part of a scheme to use the Municipal Court to generate revenue through intimidation. For years, the Santa Fe Police Department has jailed hundreds of people under this agreement in violation of their constitutional rights.

164.    The City of Santa Fe has long considered revenue generation to be the function its criminal justice system. Monthly reports from the Court Administrator to the City Council and City Manager focus exclusively on the court's capacity for generating revenue, including the dollar value of fines that were satisfied because the City put the person who owes the fines in jail.

165.    The Mayor has personally urged Police Department staff members and the Municipal Judge to do their part to ensure that people who do not pay their fines are held in jail, in violation of their right to due process, right to equal protection, and right to counsel.

166.    The Municipal Judge and court staff have agreed to keep cases open, even when the judge believes that the prosecutor could not prove the allegations, in order to raise potential revenue streams for the City.

167.    The Mayor and City Council decided to hire a City Marshal—a position devoted almost entirely to arresting people for failure to pay their fines—based on a review of the court's revenue statistics.

168.    The City Manager, Mayor, and City Council agree that the Municipal Court's primary objectives include "improve court collections" and "continue aggressive program of serving and collecting warrants."

169.    The City of Santa Fe is liable for the unconstitutional jail terms resulting from this conspiracy among its policymakers to raise revenue at the expense of the Constitution.

## CLASS ACTION ALLEGATIONS

170.    The named Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. George West and Robert Jones seek to represent the following Prospective Relief Class:

> All people who are subject to an open capias pro fine warrant issued by Santa Fe Municipal Court.

And Brady Fuller seeks to represent the following Damages Class:

> All people confined in the Santa Fe Jail since November 3, 2014, under a capias pro fine warrant resulting from an uncounseled misdemeanor prosecution in Santa Fe Municipal Court.

Plaintiff George West does not seek to act as a class representative with respect to the right to counsel claims.

171.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)-(4) and Rule 23(b)(2) (injunctive and declaratory relief for the Prospective Relief class) and 23(b)(3) (damages for the damages subclass).

## I.    The Proposed Classes Satisfy Rule 23(a)

172.    Members of the proposed classes are so numerous that joinder is impracticable. Both classes include well over forty members.

173.    Joinder is also impracticable because membership in the large proposed classes is fluid. People enter the proposed classes, and leave the Prospective Relief Class, every day. Monitoring for these changes, and joining and dismissing plaintiffs repeatedly, would not be a practical way to manage this litigation.

174.    The relief sought is common to all members of the proposed classes, and common questions of law and fact exist as to all members of the classes. Plaintiffs seek prospective relief from the Debtors' Prison Policy and the Hungry Man Policy, and damages for implementation of those policies, on a classwide basis.

175.    Among the most important, but not the only, common questions of law and fact are:

a.    Does the Police Chief jail people in violation of their rights to due process, equal protection, counsel, and right against cruel and unusual punishment?

b.     Did Santa Fe's Municipal Policymakers conspire with Judge Getty to deprive people of their constitutional rights?

c.     Is the City of Santa Fe liable for violating class members' constitutional rights in the past?

d.     Is prospective relief appropriate to stop the City of Santa Fe, the Police Chief, and Judge Getty from violating class members' constitutional rights in the future?

176.   The named Plaintiffs' claims are typical of the claims of the proposed class members, and they have the same interests as all other members of the proposed classes that they represent. The named Plaintiffs' claims arise from the same course of conduct as claims of the proposed classes, and their claims are based on the same legal theories as those of the proposed classes.

177.   The named Plaintiffs are adequate representatives of the proposed classes because they are members of the classes and because their interests coincide with, and are not antagonistic to, those of the classes.

178.   The named Plaintiffs are familiar with the City of Santa Fe's practices challenged here and the constitutional protections they seek to vindicate. The named Plaintiffs are prepared to respond to discovery requests in this case. They are committed to fulfilling the role and duties of a class representative protecting the fundamental constitutional rights of Santa Fe's poorest residents.

179.   The named Plaintiffs are represented by lawyers associated with the American Civil Liberties Union of Texas. Affidavits from Plaintiffs' counsel describing

their qualifications accompany the motion for class certification filed simultaneously with this complaint.

180.    The named Plaintiffs and their attorneys will fairly and adequately protect the interests of the members of the Class.

## V.    General Applicability, Rule 23(b)(2)

181.    Class action status is appropriate because Defendants have acted and refused to act on grounds generally applicable to the proposed class. The City's Debtors' Prison Policy and Hungry Man Policy apply equally to the class regardless of differences among class members.

182.    Plaintiffs seek final injunctive and declaratory relief protecting them from violation of their rights to due process, equal protection, counsel, and freedom from cruel and unusual punishment.

183.    Injunctive and declaratory relief with respect to each claim would be appropriate to the class as a whole. All members of the proposed class are entitled to the constitutional protections Plaintiffs seek to enforce.

## VI.    Predominance and Superiority, Rule 23(b)(3)

184.    The predominant questions in this case are whether municipal policies violate the proposed class members' constitutional rights. This question is susceptible to generalized, class-wide proof. There is no individualized evidence or legal argument required to succeed on such a claim.

185.    A class action is superior to alternative methods of trying individual claims. In this case, there is no realistic alternative for members of the proposed classes to try

their claims. As the working poor, people searching for work, and people unable to work due to disabilities, members of the proposed classes are not likely to be able to invest the resources necessary to retain an attorney or bring their claims pro se.

## CLAIMS FOR RELIEF

### Count One: Imprisonment for Failure to Pay a Fine
in violation of 42 U.S.C. § 1983, and the
Fourteenth Amendment Due Process and Equal Protection Clauses

Against the City of Santa Fe

186.   Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

187.   Plaintiffs bring this claim against the City of Santa Fe on behalf of themselves and members of the proposed classes.

188.   Under the Debtors' Prison Policy, Santa Fe police officers elect to jail people for failure to pay their fines without a predeprivation inquiry into the reasons for failure to pay, and without judicial findings that each person willfully refused to pay, that she failed to make sufficient bona fide efforts to acquire the resources to pay, or that alternative measures are inadequate to satisfy the state's interest in punishment. Santa Fe police officers are not trained to present a person to a judge before imprisonment for failure to pay, directly resulting in the past violation, and the current high risk of violation, of Plaintiffs' and proposed class members' rights to due process and equal protection.

189.   The Debtors' Prison Policy is a persistent and widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.

The Debtors' Prison Policy is the moving force behind past violations, and the current high risk of violation, of Plaintiffs' and proposed class members' rights to due process and equal protection.

190.    The City is liable because the City Council, City Manager, and the Police Chief, all know of the Debtors' Prison Policy. They have conspired with the Municipal Judge to violate Plaintiffs' and proposed class members' rights to due process and equal protection. Their failure to require officer training in ability to pay hearings evinces deliberate indifference to Plaintiffs' and proposed class members' rights to due process and equal protection.

191.    In the alternative, the City Council failed to promulgate policies to correct the Municipal Judge's persistent and widespread authorization of jail terms for failure to pay, without a predeprivation inquiry into the reasons for failure to pay, and without any of the necessary judicial findings, in violation of Plaintiffs' and proposed class members' rights to due process and equal protection.

192.    In the absence of prospective relief, Prospective Relief Class members are likely to be jailed in violation of their rights to due process and equal protection. On behalf of themselves and the Prospective Relief Class, Plaintiffs George West and Robert Jones seek declaratory and injunctive relief against the City of Santa Fe.

193.    On behalf of himself and the Damages Class, Brady Fuller seeks damages against the City of Santa Fe.

**Count Two: Denial of Counsel**
in violation of 42 U.S.C. § 1983, the
Sixth Amendment Right to Counsel Clause, and the
Fourteenth Amendment Due Process Clause

Against the City of Santa Fe

194.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

195.    Plaintiffs Robert Jones and Brady Fuller bring this claim against the City of

Santa Fe, on behalf of themselves and members of the proposed classes.

196.    Under the Debtors' Prison Policy, Santa Fe police officers elect to jail

people as a result of their uncounseled misdemeanor convictions. The officers make no

attempt to inform people of their right to counsel, take steps to appoint counsel, or elicit a

knowing, voluntary, and intelligent waiver of the right to counsel. Santa Fe police

officers are not trained in application of the right to counsel in the misdemeanor context,

directly resulting in a high risk that Plaintiffs and proposed class members will be jailed

in violation of their right to counsel.

197.    The Debtors' Prison Policy is a persistent and widespread practice among

the Santa Fe Police Department that is so common and well-settled as to constitute a

custom that fairly represents municipal policy. The Debtors' Prison Policy is the moving

force behind the high risk that Plaintiffs and proposed class members will be jailed in

violation of their right to counsel.

198.    The City is liable because the City Council, City Manager, and Police Chief

all know of the Debtors' Prison Policy. They have conspired with the Municipal Judge to

violate Plaintiffs' and proposed class members' right to counsel. Their failure to require

55

officer training in the right to counsel evinces deliberate indifference to Plaintiffs' and proposed class members' right to counsel.

199.    In the alternative, the City Council failed to promulgate policies to correct the Municipal Judge's persistent and widespread authorization of jail terms for uncounseled misdemeanor convictions.

200.    In the absence of prospective relief, Plaintiffs and proposed class members are likely to be jailed in violation of their right to counsel.

201.    On behalf of himself and the Prospective Relief class, Robert Jones seeks declaratory and injunctive relief against the City of Santa Fe.

202.    On behalf of himself and the Damages Class, Brady Fuller seeks damages against the City of Santa Fe.

**Count Three: Unlawful Detention**
in violation of 42 U.S.C. § 1983, and the
Fourteenth Amendment Due Process Clause

Against the City of Santa Fe

203.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

204.    Plaintiffs bring this claim against the City of Santa Fe, on behalf of themselves and members of the proposed classes.

205.    Under the Debtors' Prison Policy, Santa Fe police officers jail people in the absence of a facially valid court order or any other legal authority. Officers elect to jail people under a capias pro fine warrant, even if it is possible to bring the person before an appropriate court. Officers also elect jail people for longer than the next business day after their arrest, if necessary to discharge their outstanding fines. Santa Fe police officers

are not trained in the legal limits on liberty deprivation under a capias pro fine warrant, directly resulting in past violations, and the current high risk of violation, of Plaintiffs' and proposed class members' due process right against unlawful detention.

206.   The Debtors' Prison Policy is a persistent and widespread practice among the Santa Fe Police Department that is so common and well-settled as to constitute a custom that fairly represents municipal policy. The Debtors' Prison Policy is the moving force behind the past violation, and the current high risk of violation, of Plaintiffs' and proposed class due process right against unlawful detention.

207.   The City Council, City Manager, and Police Chief all know of the Debtors' Prison Policy. They have conspired with Judge Getty to violate Plaintiffs' and proposed class members' due process right against unlawful detention. Their failure to require officer training in the scope of the liberty deprivation authorized by a capias pro fine warrant evinces deliberate indifference to Plaintiffs and proposed class members' due process right against unlawful detention.

208.   In the alternative, the City Council failed to promulgate policies to correct the Municipal Judge's persistent and widespread authorization of jail terms for uncounseled misdemeanor convictions.

209.   In the absence of prospective relief, Plaintiffs and Prospective Relief Class members are likely to be jailed without lawful authority in violation of their right to due process.

210.   On behalf of themselves and the Prospective Relief Class, George West and Robert Jones seek declaratory and injunctive relief against the City of Santa Fe.

211.   On behalf of himself and the Damages Class, Brady Fuller seeks damages against the City of Santa Fe.

**Count Four: Depriving Prisoners of Adequate Food**
in violation of 42 U.S.C. § 1983, the
Eighth Amendment Cruel and Unusual Punishments Clause,
and the Fourteenth Amendment Due Process Clause

Against the City of Santa Fe

212.   Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

213.   Plaintiffs bring this claim against the City of Santa Fe on behalf of themselves and members of the proposed classes.

214.   Under the Hungry Man Policy, Santa Fe police officers feed people a calorically and nutritionally inadequate diet. The Police Chief has not promulgated any policies to ensure that someone actually gives people in his custody the small amount of food that he allocates for them to eat. The Police Chief has failed to supervise whether his staff feed people in his custody, directly resulting in past violations, and the current high risk of violation, of Plaintiffs' and proposed class members' rights against cruel and unusual punishment.

215.   The Hungry Man Policy is a persistent and widespread practice among the Santa Fe Police Department that is so common and well-settled as to constitute a custom that fairly represents municipal policy. The Hungry Man Policy is the moving force behind the past violation, and the current high risk of violation, of Plaintiffs' and proposed class members' right against cruel and unusual punishment.

216.    The City Council, City Manager, and Police Chief all know of the Hungry Man Policy. Their failure to supervise staff to monitor whether someone feeds people in the Chief's custody evinces deliberate indifference to Plaintiffs' and proposed class members' right against cruel and unusual punishment.

217.    In the absence of prospective relief, Plaintiffs and proposed class members are likely to be subjected to cruel and unusual punishment.

218.    On behalf of themselves and the Prospective Relief Class, Plaintiffs George West and Robert Jones seek declaratory and injunctive relief against the City of Santa Fe.

219.    On behalf of himself and the damages subclass, Plaintiff Brady Fuller seeks damages against the City of Santa Fe.

**Count Five: Imprisonment for Failure to Pay a Fine**
in violation of 42 U.S.C. § 1983, and the
Fourteenth Amendment Due Process and Equal Protection Clauses

Against Police Chief Jeffrey Powell

220.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

221.    Plaintiffs George West and Robert Jones bring this claim against Chief Powell on behalf of themselves and members of the Prospective Relief Class.

222.    Under the Debtors' Prison Policy, Santa Fe police officers elect to jail people for failure to pay their fines without a predeprivation inquiry into the reasons for failure to pay, and without judicial findings that each person willfully refused to pay, that she failed to make sufficient bona fide efforts to acquire the resources to pay, or that alternative measures are inadequate to satisfy the state's interest in punishment. Santa Fe

police officers are not trained to present a person to a judge before imprisonment for failure to pay, directly resulting in the past violation, and the current high risk of violation, of Plaintiffs' and proposed class members' rights to due process and equal protection.

223.   Chief Powell knows of the Debtors' Prison Policy, he has the power to change the Debtors' Prison Policy, and he has failed to do so. There is a significant causal connection between this omission and the high risk that Plaintiffs and proposed class members will be jailed in violation of their rights to due process and equal protection.

224.   Chief Powell has conspired with the Municipal Judge to violate Plaintiffs' and proposed class members' rights to due process and equal protection.

225.   Chief Powell has failed to require officer training in ability to pay hearings, evincing deliberate indifference to Plaintiffs' and proposed class members' rights to due process and equal protection.

226.   In the absence of prospective relief, Prospective Relief Class members are likely to be jailed in violation of their rights to due process and equal protection. On behalf of themselves and the Prospective Relief Class, George West and Robert Jones seek declaratory and injunctive relief against Chief Powell.

**Count Six: Denial of Counsel**
in violation of 42 U.S.C. § 1983, the
Sixth Amendment Right to Counsel Clause, and the
Fourteenth Amendment Due Process Clause

Against Police Chief Jeffrey Powell

227.   Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

228.   Plaintiff Robert Jones brings this claim against Chief Powell on behalf of herself and members of the Prospective Relief Class.

229.   Under the Debtors' Prison Policy, Santa Fe police officers elect to jail people as a result of their uncounseled misdemeanor convictions. The officers make no attempt to inform people of their right to counsel, take steps to appoint counsel, or elicit a knowing, voluntary, and intelligent waiver of the right to counsel. Santa Fe police officers are not trained in application of the right to counsel in the misdemeanor context, directly resulting in a high risk that Plaintiffs and proposed class members will be jailed in violation of their right to counsel.

230.   Defendant Chief Powell knows of the Debtors' Prison Policy, he has the power to change the Debtors' Prison Policy, and he has failed to do so. There is a significant causal connection between this omission and the high risk that Plaintiffs and proposed class members will be jailed in violation of their right to counsel.

231.   Defendant Chief Powell has conspired with the Municipal Judge to violate Plaintiffs' and proposed class members' right to counsel.

232.   Defendant Chief Powell has failed to require officer training in the right to counsel for people arrested under capias pro fine warrants, evincing deliberate indifference to Plaintiffs' and proposed class members' right to counsel.

233.   In the absence of prospective relief, Prospective Relief Class members are likely to be jailed in violation of their right to counsel.

234.   On behalf of himself and the Prospective Relief class, Plaintiff Robert Jones seeks declaratory and injunctive relief against Chief Powell.

### Count Seven: Unlawful Detention
in violation of 42 U.S.C. § 1983, and the
Fourteenth Amendment Due Process Clause

Against Police Chief Jeffrey Powell

235.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

236.    Plaintiffs George West and Robert Jones bring this claim against Chief

Powell, on behalf of themselves and members of the Prospective Relief Class.

237.    Under the Debtors' Prison Policy, Santa Fe police officers jail people in the

absence of a facially valid court order or any other legal authority. Officers elect to jail

people under a capias pro fine warrant, even if it is possible to bring the person before an

appropriate court. Officers also elect jail people for longer than the next business day

after their arrest, if necessary to discharge their outstanding fines. Santa Fe police officers

are not trained in the legal limits on liberty deprivation under a capias pro fine warrant,

directly resulting in past violations, and the current high risk of violation, of Plaintiffs'

and proposed class members' due process right against unlawful detention.

238.    Defendant Chief Powell knows of the Debtors' Prison Policy, he has the

power to change the Debtors' Prison Policy, and he has failed to do so. There is a

significant causal connection between this omission and the high risk that Plaintiffs and

proposed class members will be jailed in violation of their right to due process.

239.    Defendant Chief Powell has conspired with the Municipal Judge to violate

Plaintiffs' and proposed class members' right to due process.

240.    Defendant Chief Powell has failed to require officer training about the scope of the liberty deprivation authorized by a capias pro fine warrant, evincing deliberate indifference to Plaintiffs' and proposed class members' right to due process.

241.    In the absence of prospective relief, Prospective Relief Class members are likely to be jailed without lawful authority in violation of their right to due process.

242.    On behalf of themselves and the Prospective Relief Class, George West and Robert Jones seek declaratory and injunctive relief Chief Powell.

### Count Eight: Failure to Give Prisoners Adequate Food
in violation of 42 U.S.C. § 1983, the
Eighth Amendment Cruel and Unusual Punishments Clause,
and the Fourteenth Amendment Due Process Clause

Against Police Chief Jeffrey Powell

243.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

244.    Plaintiffs George West and Robert Jones bring this claim against Chief Powell on behalf of themselves and members of the Prospective Relief Class.

245.    Under the Hungry Man Policy, Santa Fe police officers feed people a calorically and nutritionally inadequate diet. Chief Powell has not promulgated any policies to ensure that someone actually gives people in his custody the small amount of food that he allocates for them to eat. Chief Powell has failed to supervise whether his staff feed people in his custody, directly resulting in past violations, and the current high risk of violation, of Plaintiffs' and proposed class members' right against cruel and unusual punishment.

246.    Defendant Chief Powell knows of the Hungry Man Policy, he has the power to change the Hungry Man Policy, and he has failed to do so. There is a significant causal connection between this omission and the high risk that Plaintiffs and proposed class members will be jailed in violation of their right against cruel and unusual punishment.

247.    In the absence of prospective relief, Prospective Relief Class members are likely to be subjected to cruel and unusual punishment.

248.    On behalf of themselves and the Prospective Relief Class, George West and Robert Jones seek declaratory and injunctive relief against Chief Powell.

### Count Nine: Imprisonment for Failure to Pay a Fine
in violation of 42 U.S.C. § 1983, and the
Fourteenth Amendment Due Process and Equal Protection Clauses

Against Municipal Judge Carlton Getty

249.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

250.    Plaintiffs George West and Robert Jones bring this claim against Judge Getty, on behalf of themselves and members of the Prospective Relief Class, for declaratory relief only.

251.    Defendant Judge Getty has instructed court clerks to issue, under his signature, capias pro fine warrants that purport to authorize a jail term for failure to pay a fine. Under Judge Getty's instructions, these warrants issue without a predeprivation inquiry into the reasons for failure to pay, and without a finding that each person willfully refused to pay, that she failed to make sufficient bona fide efforts to acquire the resources

to pay, or that alternative measures would be inadequate to satisfy the state's interest in punishment. Judge Getty's actions thus result in the high risk that Plaintiffs and proposed class members will be jailed in violation of their right to due process and equal protection.

252.    In the absence of prospective relief, Prospective Relief Class members are likely to be jailed in violation of their rights to due process and equal protection.

253.    On behalf of themselves and the Prospective Relief Class, George West and Robert Jones seek declaratory relief against Judge Getty.

**Count Ten: Denial of Counsel**
in violation of 42 U.S.C. § 1983, the
Sixth Amendment Right to Counsel Clause, and the
Fourteenth Amendment Due Process Clause

Against Municipal Judge Carlton Getty

254.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

255.    Plaintiff Robert Jones brings this claim against Judge Getty, on behalf of herself and members of the Prospective Relief Class, for declaratory relief only.

256.    Defendant Judge Getty has instructed court clerks to issue, under his signature, capias pro fine warrants that purport to authorize a jail term resulting from an unreliable uncounseled misdemeanor conviction. Judge Getty's actions thus result in the high risk that Plaintiffs and proposed class members will be jailed in violation of their right to counsel.

257.    In the absence of prospective relief, Plaintiffs and Prospective Relief Class members are likely to be jailed in violation of their right to counsel.

258.     On behalf of himself and the Prospective Relief Class, Robert Jones seeks

declaratory relief against Judge Getty.

**Count Eleven: Unlawful Detention**
in violation of 42 U.S.C. § 1983, and the
Fourteenth Amendment Due Process Clause

Against Municipal Judge Carlton Getty

259.     Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

260.     Plaintiffs George West and Robert Jones bring this claim against Judge

Getty, on behalf of themselves and members of the Prospective Relief Class, for

declaratory relief only.

261.     Defendant Judge Getty has instructed court clerks to issue, under his

signature, capias pro fine warrants that purport to authorize officers to jail people for

failure to pay a fine, without bringing them before a judge as required by Texas law.

Judge Getty's actions thus result in the high risk that Plaintiffs and proposed class

members will be jailed in violation of their right to due process.

262.     In the absence of prospective relief, Prospective Relief Class members are

likely to be jailed in violation of their right to due process.

263.     On behalf of themselves and the Prospective Relief Class, George West and

Robert Jones seek declaratory relief against Judge Getty.

**JURY TRIAL DEMAND**

264.     Plaintiffs demand a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court issue the following relief:

1.      An order certifying the proposed classes;

2.      An injunction prohibiting the City of Santa Fe and Chief Powell from executing a capias pro fine warrant against any class member:

      a.      who has not received a predeprivation hearing inquiring into her reasons for failure to pay, and judicial findings that she has willfully refused to pay, that she has failed to make sufficient bona fide efforts to acquire the resources to pay, or that alternative measures are inadequate to satisfy the state's interest in punishment; or

      b.      who was not represented by counsel at every critical stage of her underlying Class C misdemeanor prosecution, and did not knowingly, voluntarily, and intelligently waive her right to counsel; and, in any case,

      c.      without providing her with sufficient calories and nutrition, in accordance with a plan approved by this Court;

3.      A declaration that, by authorizing or carrying out a class member's arrest or detention for failure to pay a judgment issued by the Santa Fe Municipal Court, the City of Santa Fe, Judge Getty, and Chief Powell:

      a.      violate a class member's Fourteenth Amendment rights to due process and equal protection, if the class member has not received a predeprivation hearing inquiring into her reasons for failure to pay, and judicial findings that she has willfully refused to pay, that she has failed to

make sufficient bona fide efforts to acquire the resources to pay, or that alternative measures are inadequate to satisfy the state's interest in punishment;

        b.     violate a class member's Sixth Amendment right to counsel and Fourteenth Amendment right to due process, if the class member was not represented by counsel at every critical stage of her underlying Class C misdemeanor prosecution and in her ability to pay hearing, and she did not knowingly, voluntarily, and intelligently waive that right;

        c.     violate a class member's Fourteenth Amendment right to due process by authorizing or carrying out execution of a capias pro fine warrant in a manner unauthorized by law; and

        d.     violate a class member's Eighth Amendment right against cruel and unusual punishment, by feeding her a diet that is nutritionally and calorically insufficient, and by failing to supervise employees to ensure that she is fed;

4.     A judgment that the City of Santa Fe is liable to the Damages Class in an amount to be determined at trial, including special damages for lost wages, childcare, late fees on bills, vehicle impoundment costs, and other collateral consequences of incarceration; and general damages, or, in the alternative, nominal damages;

5.     A judgment that Defendants are liable for reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

6.    Any other relief this Court deems just and proper.

Respectfully Submitted,

By:    /s/ Trisha Trigilio

Trisha Trigilio
Attorney-in-charge
State Bar No. 24065179
S.D. Tex. Bar No. 2461809
Rebecca Robertson
State Bar No. 00794542
S.D. Tex. Bar No. 20061
ACLU of Texas
1500 McGowen Street, Suite 250
Houston, Texas 77004
Phone 713.942.8146
Fax 713.942.8966
ttrigilio@aclutx.org
rrobertson@aclutx.org