United States District Court
Southern District of Texas
**ENTERED**
August 16, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GEORGE WEST and BRADY FULLER | § § § | |
| Plaintiffs. | § § § | |
| VS. | § § | CIVIL ACTION NO. 3:16–CV–0309 |
| CITY OF SANTA FE, TEXAS and CITY OF HITCHCOCK, TEXAS | § § § | |
| Defendants. | § § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court is Defendant City of Hitchcock's Opposed Motion to Dismiss ("Hitchcock's Motion to Dismiss") and Defendants' Opposed Motion to Dismiss Plaintiffs' Claims ("Santa Fe's Motion to Dismiss"). Dkts. 54, 16.[1] These motions have been referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Dkts. 57, 59. After reviewing the briefing and applicable law, the Court RECOMMENDS that Hitchcock's Motion to Dismiss and Santa Fe's Motion to Dismiss be DENIED.

---

[1] Santa Fe's Motion to Dismiss was originally filed by Defendants City of Santa Fe ("Santa Fe"), Santa Fe Municipal Judge Carlton Getty ("Getty"), and Santa Fe Chief of Police Jeffrey Powell ("Powell") in response to the Complaint. The First Amended Complaint ("Amended Complaint") abandoned claims against Getty and Powell, dropped a named Plaintiff (Robert Jones), and added a defendant (City of Hitchcock ("Hitchcock")). The parties have filed, and the Court has considered, supplemental briefing addressing whether the claims in the Amended Complaint brought against Santa Fe should be dismissed.

## I. BACKGROUND

This lawsuit is brought by George West ("West") and Brady Fuller ("Fuller"). West brings claims exclusively against Hitchcock and Fuller brings claims only against Santa Fe. West's claims and Fuller's claims will be examined separately below.

**West's Allegations:** On May 13, 2014, West drove through Hitchcock without a valid driver's license and motor vehicle liability insurance. A police officer issued West a citation, charging him with violations of the Texas Transportation Code. That same day, West purchased an appearance bond from a private bail bond company and agreed to appear at the Hitchcock Municipal Court two weeks later to answer the charges against him.

On May 27, 2014, West appeared at the Hitchcock Municipal Court. After being informed of his right to trial, West entered a formal appearance, waived his right to trial, and pled "no contest" to charges that he drove without a driver's license and failed to show proof of financial responsibility. West agreed to pay a total fine of $738.00 in monthly installments of $100.00, with the first installment due on June 27, 2014. West acknowledged that if he failed to make the monthly payments, a warrant would be issued for his arrest. There is no allegation that West ever informed the Hitchcock Municipal Court in May 2014 that he was financially unable to pay the amount of the fine.

West did not make his first installment payment, but he did make $100.00 installment payments on July 8, 2014, and August 18, 2014. After the August 2014 payment, West did not make any further installment payments. As a result of West's failure to pay his fine, on October 8, 2014, the Hitchcock Municipal Court Judge issued a

2

capias pro fine warrant for West's arrest based on his failure to comply with the court's judgment. There are no allegations that West ever contacted the Hitchcock Municipal Court to (1) explain why he stopped paying the monthly installments; (2) contend that his financial condition prohibited him from paying the fine imposed; or (3) request an alternative sentencing arrangement.

On the afternoon of October 11, 2017, West appeared at the Santa Fe Municipal Court on a separate legal matter. Apparently tipped off as to West's whereabouts, a Hitchcock Municipal Court warrant officer appeared at the Santa Fe Municipal Court and arrested West. West asserts that his lawyer told the marshal that West "was unable to pay, explained that she was a pro bono criminal defense lawyer for impoverished clients, and volunteered to file papers demonstrating Mr. West's poverty in any court where he had open warrants." Dkt. 43 at 8. According to the Amended Complaint, West was transported to the Hitchcock jail where he was booked at 3:20 p.m. that day. West alleges that his attorney went to Hitchcock Municipal Court that afternoon and

> asked the court clerk how to present Mr. West's claim of poverty to the judge. The court clerk said that the judges had gone out of town and had not left any way to get in touch with them. The judges had not made any plan for conducting ability to pay hearings in their absence, because it is not their ordinary practice to hold ability to pay hearings before committing someone to jail on a capias pro fine warrant.

*Id.* at 9. West spent the night in jail.

The following morning, October 12, 2017, at 8:52 am, West entered an appearance at the Hitchcock Municipal Court and pled guilty to the charges pending against him. He

3

was given a credit of $829.40 for his overnight stay, which fully satisfied the amount of the fine.

West raises two Section 1983 claims against Hitchcock: (1) imprisonment for inability to pay a fine in violation of the Fourteenth Amendment Due Process and Equal Protection Clauses; and (2) denial of counsel in violation of the Sixth Amendment right to counsel clause, and the Fourteenth Amendment Due Process and Equal Protection Clauses.

**Fuller's Allegations:**  In April 2014, a Santa Fe police officer stopped Fuller and issued him a citation for driving with an expired inspection sticker.[2]  Although Fuller signed a promise to appear in Santa Fe Municipal Court on a particular date to address the allegations, he did not show up for the court date.  As a result, failure to appear charges were brought against Fuller.  Fuller then appeared in person before the Santa Fe Municipal Court Judge and pled "no contest" to the charge that he drove with an expired inspection sticker.[3]  The Santa Fe Municipal Court assessed a $307.00 fine, with $204.00 due by November 30, 2014, and $50.00 due every two weeks thereafter until the total amount of the fine was paid in full.  Fuller did not make any payments toward his fine. Fuller contends that he did not have the money to pay the fine.  He alleges that he "told the marshal that he could not afford to make a payment.  The marshal said that Mr.

---

[2] The Amended Complaint asserts that Fuller received the ticket in 2015, but that appears to be a mistake.  The documents attached to Santa Fe's Motion to Dismiss clearly indicate that the incidents giving rise to this lawsuit occurred in 2014.

[3] Fuller claims that he paid the full amount of the failure to appear ticket, utilizing funds earmarked to pay other bills.

Fuller's only option was to pay the fine; otherwise, Santa Fe would jail him for failure to pay." Dkt. 43 at 11.

Believing that jail was inevitable, Fuller claims he surrendered himself at the Santa Fe jail. But, due to an error in court records, the file failed to reflect that Fuller had already appeared to answer the failure to appear charges and signed papers for a payment plan. After one night in jail, the Santa Fe Police Department brought Fuller before the Municipal Court Judge who purportedly fixed the recordkeeping mistake by having Fuller sign a new set of papers for a payment plan. The new payment plan was for even more money than he owed before.

Fuller still could not afford the payments. As a result, a capias pro fine warrant was issued for Fuller's arrest. About six months later, Fuller was pulled over by a state trooper who ran Fuller's license and discovered the pending warrant. The state trooper turned Fuller over to a Santa Fe marshal, who took Fuller to the Santa Fe jail. "Fuller did not agree to go to jail, nor was he presented with a choice about whether to go to jail." *Id.* at 12. According to Fuller, "[t]he marshal told Mr. Fuller that the only alternative was to pay his fine in full. Mr. Fuller explained that he did not have the money, and the marshal locked him in jail." *Id.* at 12–13. Fuller spent three days in jail before being released.

Fuller complains about the conditions he encountered in the Santa Fe jail and specifically objects to being fed one Pop Tart for breakfast, one Pop Tart for lunch, and a frozen dinner. On two of the nights he spent in jail, Fuller claims that the staff at the Santa Fe jail forgot to feed him the frozen dinner.

5

Fuller asserts four separate Section 1983 claims against Santa Fe: (1) imprisonment for inability to pay a fine in violation of the Fourteenth Amendment Due Process and Equal Protection Clauses; (2) denial of counsel in violation of the Sixth Amendment right to counsel clause, and the Fourteenth Amendment Due Process and Equal Protection Clauses; (3) unlawful detention in violation of the Fourteenth Amendment Equal Protection Clause; and (4) unlawful deprivation of adequate food in violation of the Eighth Amendment cruel and unusual punishments clause and the Fourteenth Amendment Equal Protection Clause.

## II. MOTION TO DISMISS STANDARD

**Rule 12(b)(1):** A court must dismiss a suit for lack of subject matter jurisdiction under Rule 12(b)(1) where it lacks the statutory or constitutional power to adjudicate the case. *See Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). Subject matter jurisdiction fails if the plaintiff lacks Article III standing. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541–42 (1986). Therefore, when a plaintiff lacks standing to sue in federal court, it is appropriate to dismiss the action pursuant to Rule 12(b)(1) for want of subject matter jurisdiction. *See Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997). "Where . . . a motion to dismiss for lack of jurisdiction is limited to a facial attack on the pleadings, it is subject to the same standard as a motion brought under Rule 12(b)(6)." *Nat'l Coal. for Men v. Selective Serv. Sys.*, No. CV H-16-3362, 2018 WL 1694906, at *2 (S.D. Tex. Apr. 6, 2018) (citation omitted).

**Rule 12(b)(6):** A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This pleading standard does not require "detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Under Rule 12(b)(6), a party may "move for dismissal for a failure to state a claim upon which relief can be granted." *Lemieux v. Am. Optical Corp.*, 712 F. App'x 409, 412 (5th Cir. 2018) (internal quotation marks omitted). "The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (citation omitted). Dismissal is appropriate "when a plaintiff fails to allege sufficient facts that, taken as true, state a claim that is plausible on its face." *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 254 (5th Cir. 2011) (citation omitted). However, "[m]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation and internal quotation marks omitted). A 12(b)(6) motion should not be granted "unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).

On a motion to dismiss, the court's review is generally limited to the complaint and its proper attachments. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). However, courts may rely upon "documents incorporated into the complaint

by reference, and matters of which a court may take judicial notice." *Id.* (quoting *Tellabs, Inc., v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007)). Documents "attache[d] to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir. 2000).

## III. CITY OF HITCHCOCK'S MOTION TO DISMISS

### A.   STANDING

Hitchcock challenges West's standing to sue, arguing that West expressly waived in writing his right to appear before the Hitchcock Municipal Court Judge, and such waiver establishes that he has no case or controversy against the city. Importantly, Hitchcock has not explained in any meaningful way how its waiver argument affects any of the elements of standing.[4]   Nonetheless, the Court considers Hitchcock's waiver

---

[4] This alone is likely sufficient reason to deny the motion on subject matter jurisdiction grounds. *See, e.g., Waldbillig v. SSC Germantown Operating Co. LLC,* No. 08-C-1002, 2010 WL 1688535, at *2 (E.D. Wis. Apr. 26, 2010) ("The motion to dismiss for lack of subject matter jurisdiction will be denied. . . . That [Plaintiff] may have waived her right to a court forum does not affect this court's authority to consider the case. [Plaintiff's] waiver of her right to a court forum may be an affirmative defense or may indicate she has not satisfied a condition precedent to proceeding in court, matters appropriate for a summary judgment or other motion, but [Defendant] provides no authority indicating that Fed. R. Civ. P. 12(b)(1) is the correct vehicle for its challenge."); *Brady Dev. Co. v. Resolution Tr. Corp.,* 14 F.3d 998, 1007 (4th Cir. 1994) ("The doctrines of waiver and estoppel do not apply to subject matter jurisdiction determinations.").

argument in the standing context because Hitchcock explicitly makes the waiver argument in the "standing" section of its motion.

The issue of standing presents a "threshold jurisdictional question" in any lawsuit filed in federal district court. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The requirement that a party have standing to bring suit flows from Article III of the Constitution, which limits the scope of the federal judicial power to the adjudication of "cases" or "controversies." U.S. CONST. art. III, § 2. "'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To establish standing, West must allege (1) an injury that is concrete, particularized and actual or imminent; (2) a causal connection between the injury and Hitchcock's conduct; and (3) a likelihood that a favorable decision will redress the injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When ruling on a motion to dismiss for want of standing, a district court must accept as true all material allegations of the complaint and construe them in favor of the complaining party. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).

With these elements in mind, the Court examines the sufficiency of West's allegations.

## 1. An Injury That Is Concrete, Particularized And Actual or Imminent

West claims he was unconstitutionally deprived of his liberty when he was jailed overnight for no reason other than his inability to pay traffic fines in full. This claim is neither theoretical nor generalized. Indeed, the United States Supreme Court has

expressly held that "incarceration...constitutes a concrete injury" for the purposes of standing. *Bond v. United States*, 564 U.S. 211, 217 (2011) (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).  As such, West easily satisfies the first prong of the standing test.

### 2.   A Causal Connection Between The Injury And Hitchcock's Conduct

West also alleges specific facts which, if true, establish a relationship between Hitchcock's practices and his incarceration.   According to the Amended Complaint, Hitchcock has a policy in place to jail individuals, like West, who cannot afford to pay fines.  This allegation is sufficient to satisfy the causation element for standing purposes. *See League of United Latina Am. Citizens Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011) ("The causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant.") (citing *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)).

### 3.   A Likelihood That A Favorable Decision Will Redress The Injury

West alleges, and Hitchcock does not dispute, that relief from the Court would likely redress his injuries. In the Fifth Circuit, plaintiffs are entitled to at least nominal damages for any constitutional deprivation—even if they are unable to prove an actual (monetary) injury. *See Williams v. Kaufman Cty.*, 352 F.3d 994, 1014 (5th Cir. 2003) (holding any violation of constitutional rights is actionable for nominal damages). Accordingly, West's allegations satisfy the redressability prong of the standing analysis.

As evident from the above discussion, a mechanical application of the *Lujan* standing test demonstrates that the Amended Complaint sufficiently alleges facts to

establish standing.   Moreover, to the extent Hitchcock intended to advance its waiver argument in the failure to state a claim context, the outcome here remains the same.[5]

Waiver is an affirmative defense that involves "the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Addicks Servs, Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 298 (5th Cir. 2010) (citation and internal quotation marks omitted).   There is a strong presumption against the waiver of constitutional rights.   *See In Re Bryan*, 645 F.2d 331, 333 (5th Cir. 1981) ("[P]urported waivers of fundamental constitutional guarantees are subject to the most stringent scrutiny . . . ([b]ecause of the far-reaching consequences involved in a waiver of a basic right, courts indulge every reasonable presumption against waiver of a fundamental right").   Because waiver typically involves factual determinations (such as the parties' intent), it is generally inappropriate to resolve the waiver issue at the motion to dismiss stage.   *See First Interstate Bank of Ariz. v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir. 1991) ("waiver is a fact question turning on the question of intent"); *Tesco Corp. v. Weatherford Intern., Inc.*, 632 F. Supp. 2d 654, 658 (S.D. Tex. 2009) ("Waiver is typically a fact-intensive inquiry not resolved on a motion to dismiss.").   *See also Waldbillig*, 2010 WL 1688535, at *2 (indicating "waiver . . . may be an affirmative defense" and is a "matter[] appropriate for a summary judgment or other motion").   Moreover, the Fifth Circuit has recognized that a Rule 12(b)(6) dismissal based on an

---

[5] Hitchcock further contends that West's claims are not ripe because he failed to raise his claim of indigence before the Hitchcock Municipal Court.   The Court is not impressed by that argument and explains why in the constitutional deprivation section of this Memorandum and Recommendation.  *See* Section III.C.3.

affirmative defense (such as waiver) may be permitted "only if an affirmative defense or other bar to relief appears on the face of the complaint." *Garrett v. Commonwealth Mortg. Corp. of Am.*, 938 F.2d 591, 594 (5th Cir. 1991).

There is no mention of the purported waiver anywhere in the Amended Complaint. And West vigorously disputes that he waived his right to an ability to pay hearing or his right to appointed counsel, noting that the purported waiver was signed after he had been jailed. These facts, coupled with the strong presumption against the waiver of constitutional rights, militate strongly against dismissal. The Court finds, therefore, that dismissal is inappropriate at this time. The Court will defer addressing the merits of the waiver argument until summary judgment or trial, at which time the Court will have the benefit of a fully developed record.

## B.    THE ROOKER-FELDMAN DOCTRINE

Hitchcock argues that the Rooker-Feldman doctrine precludes West from seeking to overturn the state court judgments against him. *See, e.g., Weekly v. Morrow*, 204 F.3d 613, 615 (5th Cir. 2000) (the Rooker-Feldman doctrine provides that "federal district courts, as courts of original jurisdiction, lack appellate jurisdiction to review, modify, or nullify final orders of state courts"). West correctly observes that the Rooker-Feldman doctrine has no application to the instant case because he does not seek to overturn a state court judgment against him. Rather, West asks this Court to review the customs and practices he alleges deprived him of his rights. Consequently, the Rooker-Feldman doctrine does not preclude a claim, such as the one raised in this case, concerning the constitutionality of customs or practices utilized to enforce judgments. *See Brown v.*

*Taylor*, 677 F. App'x 924, 928 (5th Cir. 2017) (The Rooker-Feldman doctrine does not prevent review of "discretionary executive action taken in enforcing state court judgments").

## C.   SECTION 1983 CLAIM FOR UNCONSTITUTIONAL POLICY, CUSTOM, OR PRACTICE AGAINST HITCHCOCK

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).  To establish municipal liability under Section 1983, a plaintiff must present proof of three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom.  *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  The Court will examine all three elements to determine whether West has properly alleged a Section 1983 claim that can survive a motion to dismiss.

### 1. A Policymaker

"A plaintiff must identify a policymaker who enacted, implemented, or enforced the policy which led to the alleged constitutional violations." *Joiner v. Murphy*, No. 3:15-CV-304, 2016 WL 8792315, at *3 (S.D. Tex. Aug. 12, 2016).  *See also Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (a plaintiff must "identify a policymaker with final policymaking authority"); *Piotrowski*, 237 F.3d at 578 ("the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur").  Whether a particular official has policymaking

authority sufficient to incur municipal liability under Section 1983 is a question of state law. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

In this case, West alleges that the Chief of Police is Hitchcock's policymaker with respect to jail operations and the Municipal Court Judge is its policymaker with respect to Municipal Court administrative policies.

There does not appear to be a dispute that the Chief of Police exercises policy making authority in Hitchcock, since he has final decision-making authority to determine how to execute capias pro fine warrants. *See* HITCHCOCK, TEX., CODE §33.01 (2017) (granting Chief of Police power to "promulgate all orders, rules and regulations for the government of the police force").[6]

As far as municipal judges are concerned, a "judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992). However, municipal judges are considered policymakers if they establish policies or procedures in their administrative capacity. *See ODonnell v. Harris Cty.*, 892 F.3d 147, 155–156 (5th Cir. 2018). The Fifth Circuit recently held in *ODonnell* that county court at law judges are municipal policymakers for post-arrest practices in light of their "broad authority to promulgate rules that will dictate

---

[6] It is worth noting that the capias pro fine warrants at issue in this case directed officers to bring West "before the municipal judge," and no more. Dkt. Nos. 54-5 and 54-6. Nonetheless, West alleges Hitchcock's standard operating procedure is to incarcerate individuals, like himself, who are unable to pay fines prior to bringing them before the Municipal Court Judge and without any sort of pre-detention hearing. *See De Luna v. Hidalgo Cty.*, 853 F. Supp. 2d 623, 641–642 (S.D. Tex. 2012) (holding that municipal liability inured when chief law enforcement offers jailed arrestees over capias pro fine warrants without an ability to pay hearing); *Doe v. Angelina Cty.*, 733 F. Supp. 245, 257 (E.D. Tex. 1990) (same).

post-arrest policies consistent with the provisions of state law." *Id.* at 155. In this case, because Hitchcock's Municipal Court Judge has broad authority to "make and enforce all rules of practice and procedure," he is considered a municipal policymaker for post-arrest policies and rules governing the issuance of capias pro fine warrants. TEX. GOV'T CODE § 30.00023(a).

In sum, West's Amended Complaint alleges sufficient facts to satisfy the first element—the "policymaker" prong—to establish municipal liability.

## 2. An Official Policy

It is well-settled that a governmental entity cannot be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *See Monell*, 436 U.S. at 694. A municipality can, however, be sued and subjected to monetary damages and injunctive relief under Section 1983 if its official policy causes a person to be deprived of a federally protected right. *See id.* An official policy is:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [city] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the [city] or to an official to whom that body had delegated policy-making authority.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984); *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984). To survive a motion to dismiss, "[t]he description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot

be conclusory; it must contain specific facts." *Spiller v. Texas City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

West asserts that Hitchcock's challenged practice falls under the second definition—that is, that Hitchcock has a custom to jail individuals for their failure to pay fines without affording them an ability to pay hearing. More specifically, West claims that the Municipal Court Judge automatically issues capias pro fine warrants without holding or scheduling an ability to pay hearing, and the Chief of Police executes the warrants by jailing people without a hearing. West contends that Hitchcock jails dozens of people in this manner each year. According to the Amended Complaint, the Hitchcock marshal described this practice of jailing individuals without first determining the reason they failed to pay their fines as "how we do it in Galveston County." Dkt. 43 at 50.

West's allegations, if true, support the inference that Hitchcock's practices are so common and well-settled as to constitute a custom attributable to the city. Once again, the Fifth Circuit's recent *ODonnell* decision provides guidance. In *ODonnell*, the Fifth Circuit held that Harris County was liable for unconstitutional pretrial detention because its judges "acquiesced in an unwritten, countywide process for setting bail that violated both state law and the Constitution." *ODonnell*, 892 F.3d at 155–156. *See also Jett*, 491 U.S. at 737 (unlawful decisions include "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"). With this controlling authority in mind, the Court finds that West has sufficiently identified an "official policy" that would aid in establishing municipal liability against Hitchcock. Simply stated, West's contention that Hitchcock is liable for

16

unconstitutional post-judgment imprisonment because its Municipal Court Judge acquiesced in an unwritten, citywide process for issuing and executing capias pro fine warrants is sufficient at the initial pleading stage to adequately state an "official policy" for purposes of a Section 1983 claim.

### 3. Constitutional Deprivation

A plaintiff bringing a Section 1983 lawsuit must also support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *See Angel v. City of Fairfield*, 793 F.2d 737, 739 (5th Cir. 1986). West asserts that Hitchcock violated his constitutional rights and deprived him of his liberty by jailing him for failure to pay a fine without first conducting an ability to pay hearing. Hitchcock argues that West was not entitled to a hearing prior to his detention and that both his arrest and short incarceration were lawful.

To fully understand the constitutional issues at play in this case, it is important to briefly review the key cases addressing when, if at all, imprisonment is appropriate as punishment for a criminal defendant who fails to pay a fine. In its landmark 1971 *Tate v. Short* opinion, the United States Supreme Court held that imprisoning an individual solely because he is too poor to pay a fine violates the equal protection clause of the United States Constitution by discriminating based upon economic status. *See* 401 U.S. 395, 398 (1971) ("the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full"); *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) ("[I]mprisonment solely because of indigent status is invidious

discrimination and not constitutionally permissible."); *Barnett v. Hopper*, 548 F.2d 550, 553 (5th Cir. 1977), *vacated as moot by* 439 U.S. 1041 (1978) ("[T]he *Tate* court stated that once the determination is made that imprisonment is unnecessary and a fine would suffice, imprisonment could not then be imposed for inability to pay that fine.").

Twelve years later, in *Bearden v. Georgia*, the Supreme Court applied the lessons of *Tate* to the context of probation revocation, holding that a court cannot "revoke a defendant's probation for failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." 461 U.S. 660, 665 (1983). The high court explained:

> [A] sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority. If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.

*Id.* at 672–73.

Not surprisingly, there have been a number of cases over the years that have explored the contours of *Tate* and *Bearden*, some which address situations remarkably similar to this case. *Doe v. Angelina County* is particularly instructive since it applied

*Bearden* to capias warrants.  733 F. Supp. 245.  *See also United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993) ("Nothing in the language of the *Bearden* opinion prevents its application to any given enforcement mechanism.").  In *Doe*, the plaintiff was arrested for hunting without a license, pled guilty, and was taken to the County jail "to make a bond or pay, or . . . stay."  *Doe*, 733 F. Supp. at 248–49.  While plaintiff was being processed at the jail, law enforcement officials discovered that an outstanding capias warrant for his arrest existed because of plaintiff's failure to pay $268.00 in fines assessed as part of a prior conviction.  *See id.* at 249.  When plaintiff could not pay the outstanding fine, County officials decided to incarcerate him immediately for the period necessary to "lay out" the fine.  *Id.*  The "plaintiff was never taken before a judge, . . . no factual determination was ever made concerning the reasons for his failure to pay [the fine], and . . . no consideration was given to alternatives to incarceration."  *Id.* at 255.  Plaintiff sued Angelina County and its sheriff under Section 1983, claiming that his incarceration in the county jail for failure to pay fines violated his federal due process and equal protection rights.  The District Court agreed with the plaintiff, holding that *Bearden* "require[s] some form of a pre-deprivation procedure for determining the reasons a party has failed to pay a fine or restitution."  *Id.* at 253.  The court observed:

> Clearly, an important liberty interest is implicated when the state determines to incarcerate a person for failure to pay a fine. This fact, coupled with the likelihood of unconstitutional conduct in the absence of process, clearly requires the institution of some form of pre-incarceration legal process for determining the reasons for a party's failure to pay a fine. Absent such a procedure, a government entity that immediately converts a fine into a jail term when a party fails to pay that fine deprives the imprisoned party of liberty without due process of law. Government

conduct of this sort is unlawful whatever the economic status of the incarcerated person.

*Id.* at 254.

Citing the Fifth Circuit's *ODonnell* decision, Hitchcock argues that West was not entitled to an ability to pay hearing prior to being incarcerated for failure to pay a fine. In *ODonnell*, a group of individuals brought a Section 1983 action, on behalf of themselves and others similarly situated, against Harris County and various county officials alleging that the county's system for setting bail for indigent misdemeanor arrestees, which resulted in detention of the indigent arrestees solely due to their inability to pay bail, violated the Equal Protection and Due Process Clauses to the Constitution. In reviewing the District Court's issuance of a preliminary injunction, the Fifth Circuit noted that "the federal due process right entitles detainees to a [probable cause] hearing within 48 hours." *ODonnell*, 892 F.3d at 160. Hitchcock reads this language to mean that it has the unfettered right to detain anyone it arrests for up to 48 hours without infringing on any constitutional rights. This Court disagrees with such a reading of *ODonnell*.

*ODonnell* concerned a situation in which an individual was arrested and accused of a crime. A determination had to be made as to whether bail was appropriate. In such a situation, the Fifth Circuit held that the arrestee was entitled to a probable cause hearing within 48 hours of being detained. *See id.* at 160. The present case is much, much different. Unlike the plaintiffs in *ODonnell*, West was not at the initial stages of his case. He had already completed the underlying court proceedings, a fine had been assessed by the Court, and a final judgment had been issued. When, as here, an individual fails to pay

20

a fine that has been previously imposed by the sentencing court, *Bearden* requires some form of pre-deprivation procedure for determining whether the person is indigent and the reasons the individual has failed to pay the fine. *See Bearden*, 461 U.S. at 665. To allow Hitchcock to detain an individual—even just overnight—without providing an ability to pay hearing beforehand would, in effect, often result in individuals being jailed solely because they cannot afford to pay the fine. That is something the Supreme Court has expressly held is not permitted. *See id.* at 667–68 ("if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it").

Hitchcock further argues that West had an obligation to raise the indigence issue with the Hitchcock Municipal Court, and his failure to do so torpedoes any constitutional claim he might have. The Court strongly disagrees that the burden rests with West to bring the inability to pay issue to the Court's attention. "No court has held that indigent debtors are required to initiate proceedings to request a modification of their financial obligations or otherwise risk imprisonment for nonpayment." *Cain v. City of New Orleans*, No. 15-4479, 2016 WL 2962912, at *5 (E.D. La. May 23, 2016). To the contrary, the Supreme Court in *Bearden* emphatically stated that before a person is incarcerated for failing to pay a fine, a court "*must* inquire" into a defendant's reasons for nonpayment and, if the defendant cannot pay despite sufficient good faith efforts to do so, the court "*must* consider alternate measures of punishment other than imprisonment." *Bearden*, 461 U.S. at 672–73 (emphasis added). Not surprisingly, the Fifth Circuit has consistently interpreted *Bearden* as requiring courts to make an affirmative inquiry into

21

the reasons for failure to pay a fine before imprisoning an individual. *See United States v. Scales*, 639 F. App'x 233, 240 (5th Cir. 2016) (explaining *Bearden* "require[s] a court to inquire into the reasons for the [criminal defendant's] failure to pay before revoking probation" (citing *Bearden*, 461 US at 672)); *Payan*, 992 F.2d at 1396 (Under *Bearden*, "the proper court must inquire into the reasons for the [criminal defendant's] failure to pay.").[7] District Courts in the Fifth Circuit have followed suit. *See, e.g., De Luna*, 853 F. Supp. 2d at 647–648 (finding that Hidalgo County violated plaintiffs' due process and equal protection rights by failing to conduct an affirmative indigency determination before incarcerating them for nonpayment of fines).

Even if Hitchcock is correct and West had an affirmative obligation to bring his inability to pay to the Municipal Court's attention, the Amended Complaint clearly and unambiguously alleges that he did so. According to the Amended Complaint, West's lawyer told the arresting marshal that West "was unable to pay," and "volunteered to file papers demonstrating Mr. West's poverty." Dkt. 43 at 8. West further alleges that his attorney followed him to the Hitchcock Municipal Court and specifically asked the court clerk how to present his claim of poverty to the judge. "The court clerk said that the

---

[7] Hitchcock cites *Sorrells v. Warner*, 21 F.3d 1109, 1994 WL 171697, at *3 (5th Cir. 1994) and *Howard-Barrows v. City of Haltom City*, 106 F. App'x 912, 914 (5th Cir. 2004) for the proposition that "West was obligated to actually appear in the Hitchcock Court and assert his indigence." Dkt. 54 at 14 (emphasis in original). Although there is certainly language in both opinions indicating that the courts were concerned with the plaintiffs' failure to tell anyone they were indigent, neither case "holds that a state court's obligation to ascertain the reason for nonpayment depends on the debtor's initiating proceedings to raise his indigence to the court." *Cain*, 2016 WL 2962912, at *5 (distinguishing *Sorrells*). Notably, neither case even mentions *Bearden* and more recent Fifth Circuit authority clearly establishes that the burden is on the Court to make such an inquiry. *See Scales*, 639 F. App'x at 240.

judges had gone out of town and had not left any way to get in touch with them." *Id.* at 9. Given these allegations, it is hard to argue with a straight face that West failed to raise the indigence issue with the Hitchcock Municipal Court.[8]

By not providing an ability to pay hearing prior to his incarceration, West argues that Hitchcock deprived him of his liberty solely because he could not afford to pay the fine. Based on these allegations, West has alleged facts in support of his constitutional deprivation claim sufficient to survive dismissal on 12(b)(6) grounds. At this stage of the case, however, the Court need not make a final, binding determination on whether West's constitutional rights were violated. It is more appropriate for the parties to conduct discovery and then present a detailed factual record to the Court for a determination—at summary judgment or at trial—as to the constitutionality of Hitchcock's alleged policy of not providing an ability to pay hearing to indigent defendants before imprisoning them for failure to pay a fine. *See ODonnell v. Harris Cty.*, 227 F. Supp. 3d 706, 731 (S.D. Tex. 2016), *aff'd in part, rev'd in part*, 892 F.3d 147 (denying motion to dismiss equal protection claim because "[w]ithout a developed factual record . . . a motion to dismiss is not the right way to resolve these disputes").

---

[8] Hitchcock notes that West never complained about his inability to pay the fine when it was originally imposed in 2014. Hitchcock also questions West's assertion that he could not afford the fine, noting that West paid for an appearance bond and made two partial payments of $100 each back in the summer of 2014. These arguments are unpersuasive because a person's ability to pay is not a permanent state: an individual can experience a change in financial circumstances that causes him to be unable to meet financial obligations that he previously could satisfy. *See Cain*, 2016 WL 2962912, at *7. That being said, the Court need not decide whether West "willfully refuse[d] to pay the fine or restitution when he ha[d] the means to pay." *Bearden*, 461 U.S. at 668. It is the Municipal Court Judge's responsibility to provide a forum in which West's reasons for failing to pay are considered before committing him to jail.

Last, but not least, West asserts that Hitchcock has violated his right to counsel under the Sixth and Fourteenth Amendments. The Court has scoured the Amended Complaint and the basis for the right to counsel claim is, to say the least, far from clear. There are no substantive facts alleged demonstrating that Hitchcock had any policy in place to deny arrestees' access to counsel. Moreover, as Hitchcock notes in a recent submission, it is hard to fathom how West was denied access to counsel when his allegations plainly show that "he was represented by counsel before, during and after his arrest." Dkt. 61 at 3 (emphasis omitted). Nonetheless, the Court will not dismiss West's right to counsel claim at this juncture. With respect to the right to counsel claim, Hitchcock did not raise this precise argument in its Motion to Dismiss, and the Court is reluctant to invite the Fifth Circuit to reverse a *sua sponte* dismissal. *See Marak v. Dallas Fort Worth Int'l Airport Bd.*, 124 F. App'x 272, 274 (5th Cir. 2005) (holding that the district court's *sua sponte* dismissal of an ADEA claim was unfair and constituted reversible error because the defendant did not raise the plaintiff's ADEA claim in its motion to dismiss). Instead of dismissing this claim now, the Court believes the better avenue is to allow Hitchcock to raise the right to counsel issue on summary judgment, and let the Court address the merits of the argument at that time.

## IV. SANTA FE'S MOTION TO DISMISS

### A.   STANDING

Santa Fe first challenges Fuller's standing to assert a claim, arguing that he "executed a written waiver by which he expressly waived his rights to be released from

custody, and affirmatively requested to remain in custody for a sufficient length of time to discharge the fines he had been assessed." Dkt. 23 at 2–3 (emphasis omitted).

In short, Santa Fe attempts to raise the standing hurdle higher than required. To establish standing, an individual must satisfy the well-known *Lujan* requirements as set forth above. *See Lujan*, 504 U.S. at 560–61. As is the case with West, Fuller easily satisfies the *Lujan* standing test. Fuller alleges that he has suffered an "injury in fact" (incarceration), that his injuries are traceable, in part, to Santa Fe's actions, and that relief from the Court will likely redress his injuries through nominal or actual damages.

The question of standing is fundamentally about the propriety of an individual to litigate a claim irrespective of its legal merits. *See Warth*, 422 U.S. at 498. Santa Fe's real complaint is not that Fuller has failed to demonstrate Article III standing, but rather that the affirmative defense of waiver bars his claims. As explained above, that is not an issue that should be decided based solely on arguments raised at the beginning of a case in a motion to dismiss, especially when Fuller vociferously claims that any signed waiver was not a "knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences"—as required for a waiver of a constitutional right. *United States v. Newell*, 315 F.3d 510, 519 (5th Cir. 2002) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)). Moreover, there is no mention of the purported waiver anywhere in the Amended Complaint. *See Garrett*, 938 F.2d 591, at 594 (explaining dismissal based on defense such as waiver is permitted only if apparent on the face of the complaint"). Therefore, dismissal is inappropriate at this time. For the same reasons

25

discussed in Section III.A. above, the Court will defer ruling on the waiver issue until summary judgment or trial.

**B.      SECTION 1983 CLAIM FOR UNCONSTITUTIONAL POLICY, CUSTOM, OR PRACTICE AGAINST HITCHCOCK**

Fuller alleges that Santa Fe is liable for two official policies: (1) the Debtors' Prison Policy, by which the Chief of Police jails people without providing the arrestees an attorney or affording them a hearing for failure to pay fines; and (2) the Hungry Man Policy, under which the Chief of Police deprives people in his custody of adequate food.

As the Court has already observed, "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Piotrowski*, 237 F.3d at 578 (citation and internal quotation marks omitted).  To determine whether Fuller has alleged a Section 1983 claim that can survive a Rule 12(b)(6) motion to dismiss, it is necessary to examine each element of such a claim.

**1. A Policymaker**

The Amended Complaint alleges that the Chief of Police is Santa Fe's policymaker with respect to jail operations and City Council is its policymaker with respect to the rules of practice and procedure in the Municipal Court.  This assertion is unsurprising since "[c]ourts have consistently found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under § 1983." *Kincheloe v. Caudle*, No. A-09-CV-10 LY, 2009 WL 3381047, at *18 (W.D. Tex. Oct. 16, 2009) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1279 n.45 (5th Cir. 1992)

26

(finding that the police chief is the principal policymaker for the Arlington Police Department)). Santa Fe contends that Fuller is simply trying to blame the Chief of Police and City Council for actions for which the Municipal Court Judge was solely responsible. This argument ignores that, for purposes of a motion to dismiss, the Court must accept the Amended Complaint's factual allegations as true and must "draw all reasonable inferences in [Fuller's] favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Assuming the allegations in the Amended Complaint to be true, Fuller has stated a legal basis to satisfy the "policymaker" prong required to pursue a Section 1983 claim.

### 2. An Official Policy

To succeed on a claim under Section 1983, Fuller must also demonstrate that Santa Fe had an official "policy that acted as the moving force behind a constitutional violation." *Forgan v. Howard Cty., Tex.*, 494 F.3d 518, 522 (5th Cir. 2007) (citing *Monell*, 436 U.S. at 690–91). As explained above, an "official policy" can be evidenced through duly promulgated policy statements, ordinances or regulations, or by a custom that is such a persistent and widespread practice that, although not officially promulgated, it fairly represents a municipal policy. *See Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). "It follows that each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional." *Piotrowski*, 237 F.3d at 579. A municipality's policy of inaction despite awareness—constructive or actual—that its policy will cause a constitutional violation may be "'the functional

equivalent of a decision by the city itself to violate the Constitution.'" *Connick v.*
*Thompson*, 563 U.S. 51, 61–2 (2011) (citing *City of Canton, Ohio v. Harris*, 489 U.S.
378, 395 (1989)).

The Amended Complaint contains numerous allegations supporting the inference
that the Debtors' Prison Policy and Hungry Man Policy are "so persistent and widespread
as to practically have the force of law." *Connick*, 563 U.S. at 60 (citing *Monell*, 436 U.S.
at 691). For example, when it comes to the so-called Debtors' Prison Policy, Fuller
alleges that the Santa Fe Police Department regularly jails people for failure to pay fines
without providing them with an ability to pay hearing or counsel:

> Santa Fe law enforcement officers transfer anyone arrested under a capias
> pro fine warrant to the custody of the Santa Fe Police Chief and book her
> into jail. The Police Chief refuses to release anyone arrested under a capias
> pro fine warrant unless either she pays her fines in full, or the Department
> holds her in jail long enough to satisfy her fines with "jail credit." This
> practice of enforcing fines turns the Santa Fe jail into a modern-day
> debtors' prison, and it is unconstitutional. . . . The Santa Fe Police Chief
> prohibits people in his custody from speaking to a judge to explain why
> they failed to pay and ask for an alternative to jail. . . . [W]hen the
> Municipal Judge goes on vacation, Police Department staff do not make
> any contingency plans for presenting people who are arrested under a
> capias pro fine warrant to a judge. This is because the Police Department
> staff do not present such people to a judge in the ordinary course of
> business.

Dkt. 43 at 26, 32. Furthermore, and perhaps most shocking, Fuller alleges that the Santa
Fe Police Department has written procedures posted in the jail booking area requiring jail
time for arrestees who cannot pay, without any corresponding procedure for producing
the arrestee for a hearing or advising him of his right to counsel. Fuller argues that these
allegations, taken together, satisfy his burden to plead an "official policy."

Fuller has also pled ample factual allegations permitting the Court to infer that the Hungry Man Policy is a municipal custom. He claims that the standard practice at the Santa Fe jail is to feed prisoners one Pop Tart for breakfast, one Pop Tart for lunch, and a frozen meal for dinner. Fuller also alleges that although the Chief of Police is aware that inmates have been repeatedly deprived of food, he has taken no action to ensure that inmates are properly fed during their incarceration. *See Oporto v. City of El Paso*, No. EP-10-CV-110-KC, 2010 WL 3503457, at *3 (W.D. Tex. Sept. 2, 2010) ("While it is unnecessary to show formal, documentary approval of a governmental custom or policy in order to state a claim under *Monell*, it is necessary to allege more than a single incident of illegality . . . in order to state a claim for relief"). In short, Fuller alleges that Santa Fe's policymakers knew of customary unconstitutional practices and exhibited deliberate indifference to the risk of continuing constitutional violations. Taking these allegations as true, as is required at this preliminary stage in the litigation, Fuller has sufficiently alleged a custom that fairly represents municipal policy.

### 3. Constitutional Deprivation

The third element of a Section 1983 claim requires that Fuller adequately plead that the municipal policy or custom was the "moving force" of the constitutional deprivation, which requires a "high threshold of proof." *Piotrowski*, 237 F.3d at 580 (citing *Monell*, 436 U.S. at 694). The "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). "Congress did not intend

municipalities to be held liable [under Section 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. As a result, even though this case is in its early stages, Fuller must explain how Santa Fe deprived him of his constitutional rights in order to survive a motion to dismiss.

### a.    Debtors' Prison Policy

As far as Fuller's claims that Santa Fe failed to provide him with any sort of hearing prior to being jailed for not paying his fines, the Court has discussed the constitutionality of such a policy in great detail. *See* Section III.C.3. There is no need to repeat that analysis again.   In a nutshell, it is "fundamentally unfair" to jail someone solely because they cannot afford to pay a fine. *Bearden*, 461 U.S. at 672–73. Fuller alleges that he did not have the funds available to pay the fines imposed by the Santa Fe Municipal Court.   As a result, Fuller claims he was jailed for three days against his will without being given an ability to pay hearing.   These allegations, set forth with great specification in the Amended Complaint, are sufficient to pass muster at the motion to dismiss stage.   Presently, the Court need not issue a final, binding liability determination. The parties will be expected to present a complete factual record, argument, and proper authorities at the summary judgment stage or at trial, and the Court can properly determine at that time if Fuller has been deprived of his constitutional rights.[9]

---

[9] Like West, Fuller also alleges that his right to counsel rights under the Sixth and Fourteenth Amendments have been violated.   The Court adopts the same reasoning referenced above (Section III.C.2) for denying the motion to dismiss on the right to counsel grounds, and defers a dispositive ruling on the issue until summary judgment or trial.

### b.     Hungry Man Policy

Fuller also complains that he was denied adequate food during the three days he was incarcerated in the Santa Fe jail. He claims Santa Fe maintained a policy of feeding prisoners a daily ration of one Pop Tart for breakfast, one Pop Tart for lunch, and a frozen meal—such as a Hungry Man frozen dinner—at night. Fuller alleges that authorities forgot to feed him dinner on two nights, so he was provided dinner on only one night of his three-day stay at the Santa Fe jail. Santa Fe does not deny Fuller's description of its prison diet. Rather, Santa Fe asserts that the diet meets constitutional requirements to satisfy an Eighth Amendment inquiry because millions of people elect to eat Pop Tarts and frozen dinners every day. Santa Fe further asserts that Fuller fails to state a claim for which relief may be granted because the courts require a physical injury to demonstrate a remediable harm.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. This prohibition, made applicable to the States through the Fourteenth Amendment, "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the "minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citation omitted). *See also Gates v. Cook*, 376 F.3d 323, 332–33 (5th Cir. 2004) ("Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food . . . ." (citing *Farmer*, 511 U.S. at 832)). It is settled in the

Fifth Circuit that the provision of at least two nutritionally adequate meals daily satisfies the Eighth Amendment's constitutional requirement of adequate food for prisoners. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir. 1986). The meals must be well balanced and contain nutritional value to preserve health. *See Smith v. Sullivan*, 553 F.2d 373, 379 (5th Cir. 1977). The fact that an inmate misses an occasional meal does not necessarily implicate the inmate's constitutional rights. *See Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) ("Missing a mere one out of every nine meals is hardly more than that missed by many working citizens over the same period.").

To plead an Eighth Amendment violation based on the conditions of an inmate's confinement, a plaintiff must allege (1) conditions that pose a substantial risk of serious harm; and (2) that prison officials were deliberately indifferent to the inmate's health or safety. *See Farmer*, 511 U.S. at 834; *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015). The Court will take a closer look at the two required elements of an Eighth Amendment claim.

### i.      Conditions that pose a substantial risk of serious harm

To support his claim that the conditions in the Santa Fe jail pose a substantial risk of serious harm, Fuller argues that the prisoner diet in the Santa Fe jail consists of just 720 calories and 18 grams of protein, a diet that "is always calorically and nutritionally insufficient for an adult, even a sedentary adult." Dkt. 43 at 29. According to the Amended Complaint, these meals provide less than half of the calories any sedentary adult requires, and less than one third the federal recommendations of 2,400 calories and

56 grams of protein for a sedentary man of Fuller's age (28 years old at the time of his confinement).[10]   On two occasions, Fuller claims he was denied even this meager provision when prison officials forgot to feed him dinner, dropping his caloric intake on those days even further.[11]   Fuller further contends that a 720 calorie diet is not even enough to satisfy daily nutritional requirements for a one-year old child.   These factual allegations support the inference that the Santa Fe jail diet falls short of the constitutional baseline articulated by the Fifth Circuit of two nutritionally adequate meals per day.   *See Gonzales v. Corrs. Corp. of Am.*, 344 F. App'x 984, 985 (5th Cir. 2009) (finding nutritional deficiency of bread and cheese diet violated the Eighth Amendment).

### ii.      Deliberate indifference to the inmate's health or safety

"To establish deliberate indifference . . . , the prisoner must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).   This requires more than an allegation of mere negligence, but less than an allegation of purpose or knowledge. *See Farmer*, 511 U.S. at 835–836.   Fuller claims that his calorie—and nutrient—deficient diet posed an objective risk and that Santa Fe's

---

[10] *See* U.S. DEP'T OF HEALTH AND HUMAN SERVS., 2015–2020 *Dietary Guidelines for Americans, 8th Edition* (2015), https://health.gov/dietaryguidelines/2015/guidelines/appendix-7/.

[11] Santa Fe argues without consequence that, on one of these occasions, Fuller eventually received his frozen dinner.  However, even including the frozen meal's calories, the Santa Fe diet still falls below the Fifth Circuit's baseline of two nutritionally adequate meals per day. Furthermore, Fuller argues that these missed meals were not isolated incidents, rather they were a direct result of Santa Fe's failure develop a system to ensure prisoners are adequately and timely fed.

City Council, City Manager, and Chief of Police had either actual or constructive knowledge about the policy. If true, these allegations support the inference that city officials acted with the requisite mental culpability to satisfy this element of Fuller's claim.

Finally, Santa Fe argues that, even if the Court finds its prison diet does not pass constitutional muster, Fuller's brief confinement did not result in any physical injury that would constitute a remediable harm sufficient to state a claim for relief. The Court is not persuaded that physical injury is a required element of an Eighth Amendment claim based on prison conditions. As the Fifth Circuit has noted: "In many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food . . . constitute[s] miserable conditions." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). But, even if physical injury is a required element, Fuller's allegation that "[t]he Police Chief is not giving people in his custody enough food to stay healthy" constitutes sufficient facts to survive a motion to dismiss. Dkt. 43 at 47.

To be clear, the Court is not currently opining on the ultimate merits of Fuller's Eighth Amendment claim. The severity of Fuller's actual injuries and the degree of prison officials' mental culpability are both questions for another day. At this stage of the proceedings, the Court simply finds Fuller's factual assertions support the inference that he was deprived of the minimum diet held constitutionally acceptable in the Fifth Circuit, and that he has pled sufficient facts under the Eighth Amendment to sustain his claim for relief.

## V. CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court RECOMMENDS that the Defendant City of Hitchcock's Opposed Motion to Dismiss (Dkt. 54) and Defendants' Opposed Motion to Dismiss Plaintiffs' Claims (Dkt. 16) be DENIED.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, on August __16__, 2018.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

35